[Civ. No. 5606. Second Appellate District, Division One.—April 12, 1928.]

J. C. WILLMON, Petitioner, v. NED T. POWELL et al., Respondents.

William P. Mealey for Petitioner.

Lucien Gray for Respondents.

Jess E. Stephens, City Attorney, and C. B. Penn, Deputy City Attorney, *Amici. Curiae.*

CONREY, P. J.—This cause is presented on general demurrer to the petition. The facts are admitted to be those stated in the petition.

Article XXV of the charter of the city of Los Angeles (including sections 250, 251, 252, and 253 of the charter), by its terms established, a municipal housing commission, consisting of fifteen directors to be appointed by the mayor,

subject to confirmation by the city council. It was provided (section 251) that the said board shall have the right and power:

"(a) To incur indebtedness by the issuance of bonds in the name of the City of Los Angeles, under such terms and conditions as shall be prescribed by the council by ordinance, for any of the purposes for which the board is authorized to provide, or, for carrying out any of the powers possessed by said board; provided that such bonds shall be a lien upon the property of·the Municipal Housing Commission alone and the city shall not be liable on account thereof.

"(b) To provide by purchase, lease, condemnation, construction or otherwise, and to improve, rent, manage, sell and repurchase lands, dwellings, apartment houses, lodging houses or tenement houses, for the purpose of improving the health, safety and welfare of the inhabitants of said city, by providing homes for those who might otherwise live in overcrowded tenements, unhealthy slums, or the most congested areas, provided that none of said property or improvement shall be sold except by a majority vote of the members of said board, approved by resolution adopted by a majority vote of the Council; and provided further that whenever any of such property shall have been transferred into private ownership the same shall immediately become subject to taxation."

The municipal housing commission had been duly appointed and organized prior to the adoption of an ordinance of November 17, 1925, providing for the issuance of $1,000,000 of bonds of the said commission. It is a conceded fact that said ordinance and the various proceedings thereunder, down to and including the point where the treasurer refused to sign, and the clerk refused to affix the city's seal to bond No. 901, series No. 2, were duly and regularly conducted in accordance with the formalities prescribed by article XXV of the charter and the said ordinance. The questions raised by the refusal of the respondents and argued in support thereof, challenge the authority of the municipal housing commission and of the city of Los Angeles to issue such bonds. In other words, it is admitted that if such authority exists, the proceedings adopted in exercising that authority are in due form when tested by the procedure

outlined in article XXV of the charter and by said ordinance.

The first proposition stated by respondents is that the purpose for which the municipal housing commission was established is not a municipal affair. Counsel refer us to section 8 of article XI of the constitution providing for charters of cities, and particularly to the following sentence contained therein: "It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

The controlling principles which determine the extent of the powers of a municipal corporation have been stated as follows: " 'A municipal corporation possesses and can exercise the following powers and no others: 1. Those granted in express words; 2. Those necessarily or fairly implied in or incidental to the powers expressly granted; and, 3. Those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied.' (1 Dillon on Municipal Corporations, sec. 89.) This is the approved rule in this state. (*Von Schmidt* v. *Widber*, 105 Cal. 157 [38 Pac. 682] ; *Hyatt* v. *Williams,* 148 Cal. 686 [84 Pac. 41] ; *Oro Electric Corp.* v. *Railroad Commission,* 169 Cal. 466, 477 [147 Pac. 118].) 'If an express power to accomplish some result has been conferred, it will carry with it the authority to do such subsidiary acts as are incidental and necessary to the exercise of that power.' (*Von Schmidt* v. *Widber,* 105 Cal. 157 [38 Pac. 682].) " (*City of Long Beach* v. *Lisenby,* 175 Cal. 575 [166 Pac. 333].)

If the subject matter of the charter provisions relating to the municipal housing commission is within the description of a municipal affair, it will follow that the powers sought to be exercised by the commission are authorized by the constitution, and are granted in express words by the charter. It is argued by respondents that the business of providing homes for private individuals, even if they be

"those who might otherwise live in overcrowded tenements, unhealthy slums, or the most congested areas," constitutes a commercial enterprise unaffected by any public use and therefore cannot be a municipal affair. It is further argued that the stated purpose is not a governmental purpose because it is limited to a certain restricted class and does not include those other citizens of Los Angeles who might not otherwise live in overcrowded tenements, etc. On the other hand, it is admitted by counsel for respondents that proprietary purposes of a municipality, such as furnishing public utilities, are within the police powers, and therefore are municipal affairs and affect all the people generally.

Primarily, it is necessary to determine whether the objects and purposes of the housing commission are within the description of a public purpose. If the public nature of the enterprise is recognized, there remains little difficulty in accepting it as a municipal public purpose. In *Veterans' Welfare Board* v. *Jordan*, 189 Cal. 124 [22 A. L. R. 1515, 208 Pac. 284] the supreme court had before it for consideration the statute enacted for the purpose of creating a fund to carry on the operations of the veterans' welfare board which had been created to carry out the provisions of the Veterans' Welfare Act. For the determination of the questions arising in that case, the court found it necessary to consider at length the field of judicial decision wherein it has been attempted to determine what is a public purpose. We refer to that case, beginning at page 141 thereof, without making extensive quotations here. Grounding its decision upon the liberal views of the courts to which it referred, our supreme court took into consideration the legislative assumption that the legislation in question tended to make "for better citizenship, better notions of necessity for law and order, and a sounder and saner patriotism," and concluded that the provisions of the statute authorizing a bond issue for the purpose of acquiring, subdividing, improving, acquiring water rights for, and selling the land so improved at cost were valid as authorizing the expenditure of public money for a public purpose. If those observations were justified in that case, with equal reason it may be said that an enterprise of the kind contemplated by the charter provisions concerning the municipal housing commission, which has for its purpose the elimination of overcrowded

tenements, unhealthy slums, and congested areas, thereby tending to ward off epidemics of disease and preserve the health of all of the inhabitants of a city, is a public purpose.

The fact that in the course of administration of the affairs of the commission, private persons will receive benefit, as tenants or otherwise, of houses constructed by the commission, is not sufficient to take away from the enterprise the characteristics of a public purpose. In a somewhat analogous case in Massachusetts dealing with the question whether or not a corporation organized to provide a home for working girls was a charitable institution, the court said: "Though not paupers, they are so poor as to make it a work of charity to provide for them a home. The individuals of the class change from day to day. They are sufficiently numerous, and so a part of the public, and so connected with it and with the public welfare, as to give to the work of providing a home for any individuals comprised in the class that quality of indefiniteness in the persons helped, which, with the charitable purpose aimed at, makes a public charity in the legal sense." (*Franklin Square House* v. *City of Boston*, 188 Mass. 409 [74 N. E. 675].) See, also, *Thornton* v. *Franklin Square House*, 200 Mass. 465 [22 L. R. A. (N. S.), 486, 86 N. E. 909]; *Collier* v. *Lindley*, 203 Cal. 641 [266 Pac. 526].)

We conclude that the provisions of the charter for a municipal housing commission relate to a public purpose. And since the conditions sought to be remedied are those peculiar to a large city, we think that the business of providing such remedy in accordance with the plan stated in the charter is a municipal affair.

The second proposition relied upon by respondents is that the public use of public property cannot coexist with private management and control of such property, and that the charter has attempted to establish such private control by providing that of the fifteen directors of the commission, twelve shall be appointed from among the twenty-four largest registered holders of bonds of the commission. Manifestly, it cannot be contended that the present commission contains any holders of bonds, since no bonds have yet been issued. Moreover, it is not contended that the fact of holding such bonds would disqualify a citizen from being a member of the commission, and it might well be considered

that if the stated limitation upon the qualification of a part of the members of the commission is invalid, the mayor might disregard said direction in making his appointments, and that the existence and powers of the commission would not be affected thereby. We think that this objection is without merit.

Respondents have referred to the case of *Egan* v. *San Francisco,* 165 Cal. 576, 583 [Ann. Cas. 1915A, 754, 133 Pac. 294], where it was held that the public use of public property cannot, under any provisions of the charter of the city of San Francisco or of any statute to which the court's attention was directed, coexist with private management and control of such property. We may assume that the same statement would be true in reference to the charter of the city of Los Angeles. But the facts of that case exhibited a distinct attempt to authorize private management and control of public property of the city, not at all parallel to the provisions now under consideration of the charter of the city of Los Angeles.

It is suggested by respondents that the provision that twelve of the directors (after the commission first appointed) shall be appointed from a list of those who are registered holders of bonds of the commission is in conflict with section 24 of article I of the state constitution, which provides that no property qualification shall ever be required of any person to vote or hold office. From this it is argued that, because the charter provides that twelve of the directors shall be appointed from among the twenty-four largest registered holders of bonds of the commission, it results that the whole article is void because there cannot be a legal board of directors. Assuming for the present purpose that section 24 of article I of the constitution is not limited to the offices created by the constitution, and that it applies to limitations upon the qualification of municipal officers, this does not necessarily interfere with the existence of the commission. The charter in plain terms establishes the commission, declares the number of its directors and provides for their appointment by the mayor, subject to the confirmation of the city council. The additional clause concerning ownership of bonds, if invalid, is easily severable therefrom and may be eliminated without destroying the commission. It cannot, in our opinion, reasonably be claimed that this par-

ticular detail bears such a relation of importance to the entire plan that without this particular qualifying clause the article XXV of the charter, covering the subject of a municipal housing commission, would not have been adopted. Moreover, the charter itself (sec. 430) contains a very specific declaration of its policy and intention in relation to any such matter.

The suggestion of respondents that the city is not given any control over the conduct of the business of the commission, is not quite correct. In addition to the power of appointment of the directors, and the power to remove them "for cause," it is provided that none of the property acquired shall be sold by the commission, except when "approved by resolution adopted by a majority vote of the council."

Respondents contend that the commission is not authorized to engage in the business for which it was established. The argument is rested upon certain provisions of the charter which limit the power of the city to engage in any purely commercial or industrial enterprise. (Charter sec. 2; subd. 7 of sec. 2; sec. 3; subd. 2 of sec. 3; subd. 15 of sec. 3.) This point is answered when we have held that the enterprise is for a public and charitable purpose, and is not a "purely commercial or industrial enterprise."

And the general provision in the charter (subd. 2 of sec. 3), that "the city shall have no power to mortgage its property for any purpose," is controlled by the particular provisions relating to the municipal housing commission, which specifically authorize the issuance of bonds which shall be "a lien upon the property of the Municipal Housing Commission alone."

Incidental to their claim that the municipal housing commission is a privately controlled body, respondents contend that the members thereof are not officers of the city. They point to section 5 of the charter, which lists the officers of the city, and does not include the members of the municipal housing commission in the stated list. Nevertheless, the charter in another section does in terms provide for the commission and for the appointment of its members.

The question of their legal status, as officers or not, should be tested by their duties and functions, rather than by their designation in direct terms as officers. If their duties

and functions are those of public officers, that fact is sufficient to establish their legal status as such officers. (*Spreckels* v. *Graham,* 194 Cal. 516, 530 [228 Pac. 1040]; *Logan* v. *Shields,* 190 Cal. 661 [214 Pac. 45].)

In addition to the powers and duties of the housing commission, to which we have referred, we find it provided in the charter (sec. 63), that "each board provided for in this charter" shall have power to compel the attendance of witnesses, in proceedings and investigations before it, and in connection with those matters each member of any such board shall have power to administer oaths. Unquestionably, this is an official power.

 Counsel for respondents has suggested that the bonds in question as proposed to be issued are not serial bonds, and that the proposition of issuing said bonds was not submitted to the voters of the city. It is contended that for this reason the bonds are not in conformity to the requirements of the statutes which provide for the method of creation of bonded indebtedness of municipalities; and it is further contended that under the provisions of the charter no bonded indebtedness can be created except by the procedure directed by those statutes. In article I of the charter it is provided: "Sec. 3. The rights and powers granted by this charter shall be subject to the restrictions set forth in this section, or elsewhere in this charter. . . . (4) The general laws of the State of California establishing the procedure for the creation of bonded indebtedness in force at the time any bonded indebtedness is created by the city shall, so far as applicable, be observed and followed." If there were no other provisions covering the subject, the general rule stated in said subdivision (4) of section 3, presumably would furnish the controlling rule for the procedure in the creation of such bonded indebtedness. But in section 251 there are the particular provisions hereinbefore set forth, which declares that "the board shall have the right and power" to incur indebtedness by the issuance of bonds in the manner therein stated. The terms and conditions thereof are to be prescribed by the council by ordinance, and the bonds are made a lien "upon the property of the Municipal Housing Commission alone and the city shall not be liable on account thereof." The terms of section 251 in relation to these bonds constitute a particular

rule which must be read together with the general rule stated in section 3. The people of the city, in voting to adopt the charter, determined that the nature of the business of the municipal housing commission was such that, notwithstanding its character as a municipal affair, the bonds to be issued should not create a liability to be met by taxation, but should be secured on the specified property alone. They further determined that under these circumstances the right to issue such bonds should depend upon action by the housing commission and the city council, without submitting such matters for approval by the electors. It reasonably may be inferred that, in the opinion of the framers of the charter and the people who voted for it, the general laws relating to municipal bonds were not applicable to the plan and purpose of creation of these bonds which were to aid in financing the business entrusted to the housing commission. There appears to be no constitutional restriction upon the right of the city, by its charter, to adopt the procedure which the charter has thus established.

For the foregoing reasons we are of the opinion the demurrer should be, and the same hereby is, overruled.

Let the peremptory writ issue.

Houser, J., and York, J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 11, 1928.