[Civ. No. 17618. First Dist., Div. One. July 10, 1957.]

ERVIN W. LARSEN, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

358

Joseph A. Brown for Appellant.

Dion R. Holm, City Attorney, Jerome Cohen and John Elmer Barricklo, Deputy City Attorneys, Keil & Connolly, Edward D. Keil and James Shaughnessy for Respondents.

BRAY, J.—Plaintiff brought this taxpayer's suit to restrain the city and county of San Francisco from appropriating $2,000,000 to purchase a parcel of real property at Fifth and Mission Streets, and to restrain all defendants from carrying out the provisions of an agreement[1] entered into between defendant Shoppers Downtown Parking, a corporation, and the city. Plaintiff appeals from the judgment in favor of defendants.

QUESTIONS PRESENTED

1. Are the parking laws unconstitutional because of alleged arbitrary powers conferred upon the Parking Authority?

2. Is the agreement invalid?

3. Does the procedure adopted to acquire the parking site violate the city charter?

4. Is a public off-street parking facility a public utility?

5. Are the findings supported?

FACTS

The city, by ordinance in 1955, appropriated $2,000,000 from the unappropriated balance of the 1947 Off-Street Parking Bond Fund, to acquire the above mentioned property for

[1]Pursuant to the authority of Parking Law of 1949 (Sts. & Hy. Code, §§ 32500-34859).

a public off-street parking facility with a capacity of approximately 1,000 automobiles to be constructed and operated thereon. The site was designated and recommended to the board of supervisors by the parking authority of the city on the basis of studies and reports conducted over a period of approximately eight years and was approved by the board. February 28, 1956, the board adopted a resolution authorizing the acquisition of the property by eminent domain proceedings for a public off-street automobile parking site. July 24, 1956, the board passed a resolution authorizing the execution of an agreement between the city and Shoppers Downtown Parking, a nonprofit corporation. The substance of that agreement follows: (1) The city will acquire the above mentioned site. (2) The corporation will at its own expense construct thereon the garage facility required by the city and the title to the facility will vest in the city upon construction. (3) The corporation will finance the cost of construction by borrowing money, which loan will be evidenced by notes of the corporation designated as construction finance notes. (4) All the corporation's stock will be placed in trust for the city. (5) The city will call for bids for an operating lease of the facility. The form of lease is attached to the agreement. The lease requires that the construction finance notes will be paid from the revenues of the project, whether the lease be awarded to the corporation or to some other person, firm or corporation. (6) The corporation is permitted to bid for the lease on the same footing as any other bidder, and agrees to submit a bid for the operating lease which will be equal to 100 per cent of the net receipts, i. e., the amount remaining at the end of each year after payment of the expenses of the facility and debt service upon the construction finance notes out of gross revenues. (7) The corporation shall have no recourse against the city for payment for the construction of the facility and agrees to look solely to payments made by the lessee upon the construction finance notes for reimbursement for such costs.

The form of lease provides: (1) a term of 50 years, subject to the right of the city to terminate the lease any time after the construction finance notes have been paid. (2) Lessee shall pay the indebtedness incurred by the corporation to finance the construction of the facility, as evidenced by the construction finance notes. (3) Lessee shall pay all gross receipts from operation of the facility to the bank which is authorized to disburse them as follows: (a) all amounts payable on account of the indebtedness incurred by the corpora-

tion to finance construction; (b) to lessee, all normal and reasonable operating expenses, subject to examination, audit and approval of the city controller; (c) to lessee, all administrative and management expenses not to exceed $10,000 per year; (d) to the corporation, all monthly operating expenses such as franchise taxes, etc., approved by the city controller; (e) to the bank, for the account of the city the agreed percentage of the net receipts; (f) to lessee, the amount, if any, remaining. (4) The premises will be used solely for the operation of a public automobile parking facility and for the incidental sale of petroleum and petroleum products. (5) The rates and charges for parking will be established by the city from time to time, and, subject to modification by the city, an initial rate of 15 cents per hour is fixed.

### 1. *Constitutionality of Parking Laws.*

The claimed unconstitutionality of these laws is based primarily upon the contention that the Parking Authority provided therein is granted arbitrary powers and is a ''legal Frankenstein.'' These laws create in each city a public body corporate and politic known as the Parking Authority of the city. Such authority shall not function until the legislative body of the city by resolution declares that there is need for the authority to function therein. (The board of supervisors by resolution declared such necessity.) Sections 32800-32956, Streets and Highways Code, set forth the powers of the authority. They are many and broad. It is not necessary to detail them here. They are similar to, and, in many respects, the same as the powers granted the Housing Authority by the Housing Authorities Law and the Housing Cooperation Law.[2] These laws were held to be constitutional in *Housing Authority* v. *Dockweiler,* 14 Cal.2d 437 [94 P.2d 794], reaffirmed in *Kleiber* v. *City of San Francisco,* 18 Cal.2d 718, 719 [117 P.2d 657]. The provisions of the Parking Law of 1949 are similar to the provisions contained·in the Community Redevelopment Law (Health & Saf. Code, §§ 33000-33954) held to be constitutional in *Redevelopment Agency* v. *Hayes,* 122 Cal.App.2d 777 [266 P.2d 105].

These cases demonstrate that the powers given the Parking Authority created by the parking laws are not ''an unconstitutional delegation of executive, legislative and judicial powers, to an irresponsible body which is described

---

[2]Health & Saf. Code, §§ 34200-34368, Stats. Ex. Sess. 1938, p. 9, Deering's Gen. Laws, 1939 Supp., Act 3484; Stats. Ex. Sess. 1938, p. 1, Deering's Gen. Laws, 1939 Supp., Act 3485.

as a 'public body corporate and politic . . .' '' The power given the Parking Authority of eminent domain, the power to make contracts and leases, to make regulations to carry into effect the purposes of the parking laws and all the other powers provided by those laws, are similar to and no more arbitrary than those granted Housing Authorities by the housing laws above mentioned and which were held to be constitutional in *Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437. The purposes to which the parking projects are to be devoted are public ones, and that ''necessarily answers the contention addressed to the exercise of the right of eminent domain by the authorities created to carry on such projects.'' (P. 452.)[3]

Many of the criticisms of the laws by plaintiff are captious, such as ''The very name 'authority' is repellant to the fundamental concept of constitutional liberty, and to the theory of separation of powers and of government of checks and balances.'' What of the Toll Bridge Authorities, Port Authorities, and the many other public authorities, throughout the United States, having similar powers to those being considered here, the laws creating which have been uniformly upheld?

Applicable here is the following from *Gaylord* v. *City of Pasadena,* 175 Cal. 433 [166 P. 348] (reaffirmed in *Carter* v. *Stevens,* 211 Cal. 281 [295 P. 28]; *Stanislaus Co. etc. Assn.* v. *Stanislaus,* 8 Cal.2d 378 [65 P.2d 1305]): ''Even a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs—national, state and municipal—and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many quasi-legislative and quasi-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are intrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For, as

---

[3] ''The supplying of additional parking facilities and the performance of all undertakings incidental or advantageous thereto are public uses and purposes for which public money may be spent and private property acquired, and are governmental functions.'' (Sts. & Hy. Code, § 32501.)

the Supreme Court of the United States declares: 'Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be "to stop the wheels of government" and bring about confusion, if not paralysis, in the conduct of the public business.' (*Union Bridge Co.* v. *United States,* 204 U.S. 364 [27 S.Ct. 367, 51 L.Ed. 523].)'' (Pp. 436-437.)

We find nothing in the laws which gives the authority arbitrary powers. Actually the powers given are logical, natural and necessary to the accomplishment of the purposes of the act—to provide publicly controlled off-street parking for the public—a purpose which modern developments and practices make most necessary to the well being of the citizens of a city.

Also applicable is the following from *Holloway* v. *Purcell,* 35 Cal.2d 220, 231 [217 P.2d 665] : ''The statutes in question require the commission to exercise its authority only on 'such terms and conditions as in its opinion will best subserve the public interest.' That requirement provides an adequate standard to guide the commission. This court and the Supreme Court of the United States have repeatedly held it sufficient that the authority be exercised as 'necessary or advisable to effectuate the purposes' of the statute [citations], or when 'in the public interest it deems it necessary in order to protect the consumer' [citations], or as the agency deems it to be 'in the public interest' to so act [citations]. The Legislature has adopted a policy of freeway construction in the public interest. It has properly delegated to the highway commission the authority to determine when and where freeways will be constructed, and it has properly required that the authority be exercised in accord with the needs of the public interest. Such a delegation of legislative power is valid.''

There is no division of authority in California on the right of a city to condemn property for off-street parking. Plaintiff cites *City of Whittier* v. *Dixon,* 24 Cal.2d 664 [151 P.2d 5, 153 A.L.R. 956], upholding such power under the Vehicle Parking District Act of 1943, and quotes from page 667 : ''Just as public streets can be used for the parking of motor vehicles, property can be acquired for the same use. Moreover, public parking places relieve congestion and reduce traffic hazards and therefore serve a public purpose. They

may be compared to municipal airports, which have been recognized as public improvements." Plaintiff then contends that *City & County of San Francisco* v. *Ross*, 44 Cal.2d 52 [279 P.2d 529], holds to the contrary. It does not do so. It expressly recognizes such power in the city, but holds that it cannot be exercised to "secure to private activities the means to carry on a private business whose primary objective and purpose is private gain and not public need" (p. 59) and that the failure there to provide (as is provided in our case) any control by the city over the rates to be charged to customers and the regulations for operating the facility proved the whole enterprise to be one for private gain rather than public need. Moreover, there 4 per cent of the floor area was to be devoted to commercial activity not customarily associated with parking operations. There is no such situation here. The court there discussed with apparent approval *Berman* v. *Parker*, 348 U.S. 26 [75 S.Ct. 98, 99 L.Ed. 27], which held valid the District of Columbia Redevelopment Law of 1945 (60 Stat. 790, D.C. Code, 1951, §§ 5-710—5-719) which provided for leasing or selling to private parties for redevelopment lands condemned thereunder and pointed out that it was the "stringent controls maintained over the properties sold or leased to private parties" which distinguished the case from the Ross case where such controls were lacking.[4]

2. *The Agreement.*

The agreement, boiled down, provides that the city will provide the real property, the corporation will erect or cause to be erected thereon "a public off-street parking facility" in conformance to the city's requirements, the cost to be repaid the corporation by sums to be paid by the lessee; to insure performance of the agreement and to enable the corporation to borrow the costs of construction the corporate stock will be vested in a certain bank in trust for the city. When the facility is completed the facility shall be leased for operation to the highest bidder under the form of lease attached to the agreement; the parking rates shall at all times be fixed by the authority; when the facility is paid for from the receipts under the lease, the lease may terminate.

The arrangement to finance the construction of the facility

[4] In our case they are provided. Ordinance 9072 is expressly incorporated in paragraph 27 of the lease. That ordinance deals with leases by the city of off-street parking areas and contains many controls and regulations.

is pursuant to the authority of section 32809, Streets and Highways Code: "The authority may borrow money or *accept financial* or other assistance from the city, the State, the Federal Government, or *any other source* for or in aid of any parking facility within its area of operation, and *to such ends may comply with any conditions attached thereto.*" (Emphasis added.) The effect of the arrangement is that the city, acting through its board of supervisors, and the corporation, have entered into an agreement which provides principally for two things: (1) the construction of the facility by the corporation and the payment out of gross revenues from the operation of the moneys borrowed to pay the cost of construction; (2) the right of the city as soon as the cost is repaid to terminate the lease and to take over the operation of the facility thereafter.

Plaintiff contends that because the corporation may bid, the provision providing for competitive bids is a "mere simulation of compliance with the law" and that only the corporation "has the slightest chance of obtaining the lease." The agreement provides, paragraph 5, page 8: ". . . City, pursuant to the provisions of Chapter 4 of the Parking Law of 1949, shall call for bids, and subject to the provisions of this paragraph, make an award of an operating lease of said facility." The particular provision of the parking law applicable is section 32952 of the Streets and Highways Code. In part, it provides: "The authority may lease any project acquired by it pursuant to this part to the *highest responsible bidder* after the publication of a notice inviting bids . . ." (Emphasis added.) We find nothing in the agreement or the terms of the lease which would eliminate the probability of obtaining bidders other than the corporation. ■ For the above mentioned reasons we find nothing in the agreement or the provision which violates charter provisions which require competitive bidding.

Paragraph 5 of the agreement provides that the successful bidder for the lease must execute a deed of trust of his interest in the lease to secure the payment of the corporation finance notes evidencing the loan for the construction of the facility. The escrow instructions under which this deed of trust is deposited with the title company are subject to the approval of the city and the corporation. As the corporation is liable for the payment of these notes we can see no legal objection to its being permitted to approve the instructions by which

the deed of trust is deposited with the title company awaiting the execution of the lease and the completion of the documents necessary to be executed by the corporation in obtaining the loan. Nor can we see any legal objection to the fact that the bidder is required to be "reasonably satisfactory" to the beneficiary of the deed of trust. Such beneficiary will be the lender of the money to the corporation for the construction of the facility. Any objection of the beneficiary to a bidder would have to be based upon bona fide reasons. This clause in no way takes away from the city its real control of the awarding of the lease. Contrary to plaintiff's assertion, there is no provision requiring the corporation's approval of the bidder to whom the contract is to be awarded. There is a provision that the city may not consent to any change in or assignment of the lease after execution by the successful bidder without the consent of said beneficiary and the corporation. In view of the large financial interests the beneficiary and corporation will then have in the facility such provision in nowise affects the legality of either the agreement or the lease. Again here any refusal to consent would have to be based upon sufficient reasons. The city would still be in control of the situation.

Plaintiff contends the agreement is invalid because in the form of lease, the percentage of the net profits which the lessee shall pay the city is left blank. This is the biddable portion of the lease and must necessarily be left blank in the form of lease, to be filled in by the percentage bid by the highest responsible bidder. Nor may the corporation bid "as low as it desires." In the agreement, it agrees to bid a sum equal to 100 per cent of the gross receipts less amounts disbursed for the purposes set forth in the agreement.

There is nothing invalid in the provision in the lease concerning the covenant against assignment without the written consent of the city, "which consent shall not be unreasonably withheld by the city." This is a phrase commonly used in leases and is not so indefinite as to be likely to cause future litigation as is contended by plaintiff.

Again, criticism is made of the fact that the lessee may sell merchandise such as cigarettes, coca cola and candy. The lease, in effect, limits these matters to commercial activities customarily found in parking facilities. They are expected by the public and are so small both in the area to be used and as to income therefrom as to be merely incidental to the parking activity.

### 3. *City Charter.*

Section 32502, Streets and Highways Code (Parking Law of 1949) provides that the procedure under said law is an "alternative method" and does not abridge, modify or otherwise affect the right of any city to exercise any power given it by the Constitution. The powers sought to be exercised by the city could be exercised either under the provisions of the Parking Law of 1949 which expressly confers upon the city in its capacity as a parking authority the powers it proposes to exercise or by the general powers conferred upon the city as a home rule chartered city without the aid of state legislation. ■ The city charter " '. . . operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs. . . . A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon . . . is clearly indicated. So guided, reason dictates that the full exercise of the power is permitted except as *clearly and explicitly* curtailed. . . .' " (*Acton* v. *Henderson,* 150 Cal.App.2d 1, 13 [309 P.2d 481]; emphasis added.)

Here, of course, the city acted under the said parking law, the aforesaid alternative method. Plaintiff contends that the procedure here violated several provisions of the city charter, citing a provision in the Parking District Law of 1951 (Sts. & Hy. Code, § 35703) to the effect that in a parking district formed under the latter act, if any powers or duties prescribed by the act conflict with such powers or duties prescribed by the charter, the latter powers or duties shall apply. However, here the Parking District Law of 1951 was not used and hence cannot apply. Moreover, as hereafter pointed out, the procedure followed here under the 1949 act in nowise violates any provision of the charter.

■ Off-street parking facilities are purely a municipal affair. (*Mallon* v. *City of Long Beach,* 44 Cal.2d 199, 211 [282 P.2d 481].) We find no restriction in the charter of any of the powers exercised and proposed to be exercised by the city in either the agreement or the lease. The charter sections referred to by plaintiff do not provide any such restriction. ■ Section 93 deals only with "surplus property." The property here is not "surplus." It is being acquired for a municipal purpose—the establishment of a public off-street parking facility. The lease of the facility for not to exceed 50 years is expressly authorized by ordinance 9072 and section 37394, Government Code. ■ Section 42 deals

with the power of the Recreation and Park Commission to lease property under its jurisdiction. Obviously it is not relevant here.

### 4. *Facility Not a Public Utility.*

 Section 123 deals with leases by the board of supervisors of public utilities. The proposed facility is not a public utility within the meaning of that section. Neither the charter, any legislative act nor the Constitution, has defined off-street parking as a public utility. In the operation of public utilities owned and operated by a city the latter acts in a *proprietary* capacity. (See *Logan* v. *City of Glendale,* 132 Cal.App. 169 [22 P.2d 552].) The Parking Law of 1949, section 32501, Streets and Highways Code, provides: "The supplying of additional parking facilities and the performance of all undertakings incidental or advantageous thereto are public uses and purposes for which public money may be spent and private property acquired, *and are governmental functions."* (Emphasis added.) The Parking Law of 1949 vests the control of rates and charges in the Parking Authority (the city exercising the power of a parking authority). The Constitution vests control of privately owned public utilities in the state's Public Utilities Commission. A municipally owned public utility is regulated by a municipal regulatory body, varying in name in the various municipalities. Had the Legislature considered public off-street parking to be a public utility it would have vested, so far as it could, such control in the municipality's regulatory body. Of some significance is the provision in section 10 of ordinance 9072, that it is the city's intention and declaration that off-street parking facilities are not *public utilities* and not subject to the jurisdiction or control of the city's Public Utilities Commission.[5] As we said in *Acton* v. *Henderson,* 150 Cal.App.2d 1, 14 [309 P.2d 481], ordinances enacted pursuant to competent authority " '. . . will be supported by every reasonable intendment. . . . Courts are bound to uphold municipal ordinances and by-laws unless they manifestly transcend the powers of the enacting body.' " (P. 14.)

In *Glass* v. *City of Fresno,* 17 Cal.App.2d 555 [62 P.2d 765], the city decided to undertake the collection of garbage and resolved that such operation, although charging fees,

---

[5]See *Parr* v. *Ladd,* 323 Mich. 592 [36 N.W.2d 157], *Cleveland* v. *City of Detroit,* 324 Mich. 527 [37 N.W.2d 625], to the effect that public parking facilities are not public utilities.

would be conducted as a governmental function. It did not follow the provisions of its charter relating to the operation of a public utility. The court held that the proposed operation was not a public utility and that the recital in the resolution that it was to be operated as a governmental function of the city must be accepted by the courts.

Section 82 of the charter requires payment to the city treasurer of all funds collected by any employee of the city or in connection with its business. Section 64 relates to the keeping of accounts showing all financial transactions of all departments and offices of the city. Section 72 deals with the city's annual budget. Plaintiff contends that the agreement, lease and trust fund created violate these provisions of the charter. The trial court found that under the terms of the agreement and lease no money is to be received or come into the hands of any officer or employee of the city. This, of course, does not apply to the city's percentage of the income of the operation of the facility. That will come into the city treasury. It refers to the moneys received and disbursed in the operation of the facility including the payment of the costs of construction and all other charges. They, of course, will not be received by anyone connected with the city. This operation is properly in the hands of the lessee and the bank handling the trust funds. The lessee is required to deposit all receipts with the bank until the debt incurred for the construction of the facility is paid. If the city then takes over the facility there will be public funds or moneys which must be deposited with the city treasurer. Thus there is no attempt to circumvent the provisions of the charter relating to the custody of public funds.

5. *Findings.*

The first finding attacked is to the effect that the selection of the site as a necessary and convenient one for the location of a public off-street parking facility was upon the basis of competent and economic engineering advice and of constant and comprehensive traffic engineering studies. The record so amply supports this finding that we deem it unnecessary to discuss the voluminous studies and reports in evidence. Plaintiff's criticism of these reports is mainly that some of them were made by persons other than officers and employees of the city, the authority for obtaining which and the source of the money for paying those who were employed, plaintiff questions. We see no necessity for going into that question. The reports were considered and there being sub-

stantial evidence to support the trial court's conclusions we are without power to overrule those conclusions. Whether as contended the city "squandered the public money on so-called experts from other sections of the country to conduct surveys" we are not required to determine.

Paragraph XIII of the complaint alleged that the public off-street parking project was not for the best interests of the city but for the benefit only of a few merchants having places of business in the immediate vicinity, and for the benefit of private persons owning private vehicles who serve no public purpose, and that the project constitutes an attempt to enrich a private corporation at public expense. ▇ The court found "That the allegations in paragraph XIII of plaintiff's complaint are not true." Plaintiff contends that such a finding is no finding at all, citing several cases upholding the well known rule that the court must find on all material issues. Plaintiff cites no case holding that the type of finding above set forth is not sufficient. *Kennedy & Shaw Lbr. Co.* v. *S. S. Const. Co.*, 123 Cal. 584, 585 [56 P. 457], and *Mercurio* v. *Department of Alcoholic Beverage Control*, 144 Cal.App.2d 626, 635-636 [301 P.2d 474], hold that it is.

Plaintiff produced testimony of a number of witnesses to the effect that privately owned garages in the general neighborhood of the proposed facility do and would amply take care of all parking requirements. This merely created a conflict with respondents' evidence. ▇ We adopt the language of *Barnes* v. *City of New Haven* (1953), 140 Conn. 8 [98 A.2d 523], which upheld a parking authority act of Connecticut: "The aggravated nature of the traffic problem on city streets and the serious effect which it has upon a very large part of the public in such localities are a matter of common knowledge of which courts take judicial notice." (P. 527.) ▇ That case then points out that whether the act provides "for a legitimate public purpose in the constitutional sense involves the question whether it primarily serves, in a reasonable manner, to promote the public welfare." (P. 527.) ▇ "A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation." (P. 527). ▇ Concerning contentions similar to ones made in our case

the court said (p. 529): "That the authority's operation of its parking facilities may involve some incidental loss to private competitors constitutes no reason for holding that the act does not meet a legitimate public purpose. It is no constitutional objection to a statute which provides for the development of parking facilities, 'nor does it derogate from the public character of its objective, that the Authority will to some extent conduct what may heretofore have been regarded as a private enterprise . . .' Nor does the possibility that the act may prove of greater benefit to store owners in the shopping district than to some other residents of the city render it invalid as discriminatory, any more than would the outlay of public funds to pave a particular section of street, with its greater benefit to the immediate abutters than to others. . . . Again, the leasing of a parking facility by the authority to another to operate would not be inconsistent with the public character of the facility, since the fact that such private lessee may gain thereby is merely incidental to the public purpose of operating it for the use of the public.''

 ''Just as public streets can be used for the parking of motor vehicles, property can be acquired for the same use. Moreover, public parking places relieve congestion and reduce traffic hazards and therefore serve a public purpose. They may be compared to municipal airports, which have been recognized as public improvements.'' (*City of Whittier* v. *Dixon, supra,* 24 Cal.2d at p. 667.)

Undoubtedly, the stores in the neighborhood of the facility, such as the Emporium, Hale's and Penney's, referred to by plaintiff, will obtain benefit from operation of the facility. That fact is not sufficient to take away from the enterprise the characteristics of a public purpose. See *Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437, 450-451, quoting from *Willmon* v. *Powell,* 91 Cal.App. 1 [266 P. 1029], where it was urged that the proposed housing development resembled a commercial enterprise rather than a public use or function. ''Among other things, it was there stated that 'The fact that in the course of administration of the commission, private persons will receive benefit, as tenants or otherwise, of houses constructed by the commission, is not sufficient to take away from the enterprise the characteristics of a public purpose.' ''Once it is determined that the taking is for a public purpose, the fact that private persons may receive benefit is not sufficient to take away from the enterprise the characteristics of a public purpose.'' (*Redevelopment Agency* v. *Hayes, supra,*

122 Cal.App.2d at p. 804; see also *County of Los Angeles* v. *La Fuente*, 20 Cal.2d 870, 877 [129 P.2d 378].)

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 4, 1957.