CITY OF PALO ALTO et al.,
Plaintiffs-Appellees,

v.

CITY AND COUNTY OF SAN FRANCISCO, Defendant-Appellant.

No. 75–1256.

United States Court of Appeals,
Ninth Circuit.

Feb. 24, 1977.

Rehearing Denied March 31, 1977.

McMorris M. Dow, Deputy City Atty. (argued), Thomas M. O'Connor, City Atty., San Francisco, Cal., for defendant-appellant.

Arthur T. Bridgett, John J. Vlahos (argued), Hanson, Bridgett & Marcus, San Francisco, Cal., for plaintiffs-appellees.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and EAST,* District Judge.

## OPINION

HUFSTEDLER, Circuit Judge:

Appellees, seven cities and eight districts located in the San Francisco Bay area ["Bay Cities"], brought suit in the district court against the appellant, the City and County of San Francisco ["San Francisco"], to enjoin a proposed 20.5 percent increase in the water rate charged to them by appellant. Because San Francisco increased the rates to its own inhabitants by only 14.5 percent, appellees allege that their increase violates the Raker Act of December 19, 1913, ch. 4, 38 Stat. 242, as discriminatory and not related to appellant's cost in providing them service. Appellees also seek to enjoin, under the aegis of the Raker Act, the transfer of $2.9 million in surplus funds from San Francisco's water department to its general fund.[1] Appellees claim that this surplus was generated from revenues created by the Raker Act, and that they should be plowed back into the water system, rather than enriching the coffers of San Francisco residents.

The district court issued a preliminary injunction restraining both the imposition of the proposed rate increases and the transfer of surplus water department funds into San Francisco's general fund pending a hearing on the merits. Appellant appeals the order granting a preliminary injunction, contending that the district court did not

have subject matter jurisdiction over appellees' claims and that the Raker Act does not create a private cause of action in favor of the Bay Cities.

■ The district court properly found that it had federal question jurisdiction (see 28 U.S.C. § 1331 (1966)) to adjudicate the Bay Cities' claims. While appellees correctly state that rate-making is usually a subject within state competence, the setting of water rates is not at issue in the present case. The issue that the Bay Cities raise is whether the proposed water rates, as established by local law, violate the Raker Act if they discriminate against the Bay Cities on any other basis than cost. So cast, the question is a federal one. (See *Cohens v. Virginia* (1821) 6 Wheat 120, 170, 19 U.S. 264, 378, 5 L.Ed. 257 (". . . A case in law or equity . . . may truly be said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either."); *King County v. Seattle School District No. 1* (1923) 263 U.S. 361, 44 S.Ct. 127, 68 L.Ed. 339 (Where federal statute granted certain funds to state and provided that state legislature determine allocation of funds between local schools and roads, issue of whether federal statute requires equal apportionment between schools and roads raised a federal question.); *Littell v. Nakai* (9th Cir. 1965) 344 F.2d 486, 487; *Ivy Broadcasting Co. v. American Telephone and Telegraph Co.* (2d Cir. 1968) 391 F.2d 486, 493 ("[T]hat federal law furnishes a necessary ingredient of a claim is insufficient as a basis for federal jurisdiction, unless the claim presents an issue requiring construction of an Act of Congress or unless a distinctive policy of an Act of Congress requires that federal principles control the disposition of the claim.").)

■ It is not necessary for us to decide whether the Raker Act creates a private cause of action on behalf of appellees under

---

* Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

1. Appellant alleges that this surplus represents the proceeds from the condemnation of water department lands in San Mateo County by the State of California for freeway purposes.

the reasoning of *Nat'l Railroad Passenger Corp. v. Nat'l Assoc. of Railroad Passengers* ["Amtrak"] (1974) 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 and its progeny. The Bay Cities are intended to be direct beneficiaries of the Raker Act; accordingly, they have standing to assert a violation of that Act. (*See Hardin v. Kentucky Util. Co.* (1968) 390 U.S. 1, 7, 88 S.Ct. 651, 655, 19 L.Ed.2d 787 (". . . Since respondent is thus in the class which . . . [the statute] is designed to protect, it has standing under familiar judicial principles to bring this suit, . . . and no explicit statutory provision is necessary to confer standing.").)

The Raker Act was passed in the aftermath of the great San Francisco earthquake and fire to grant access to the water and hydroelectric resources of the Hetch Hetchy Valley in Yosemite National Park. The Act met with strong opposition from environmental groups who objected to the destruction of the pristine splendor of the Hetch Hetchy Valley. Instrumental in the defeat of the environmental viewpoint was the demonstrated need for a cheap and abundant supply of water to accommodate the growing power and water demands of the Bay Area. The legislative debates are replete with discussion of the projected population growth of the Bay Cities as well as of San Francisco proper and the demand for water which such growth would entail.[2]

Not only were the legislators cognizant of the Bay Cities' need for new water supplies, but they were also aware that the financial resources of the Bay Cities would be needed to help build the facilities necessary to generate Hetch Hetchy water and electric power.[3] (*See* 50 Cong.Rec. 3920 (1913) (remarks of Rep. Knowland).) Thus, the role of the Bay Cities as both beneficiary and benefactor in tapping the resources of the Hetch Hetchy Valley was contemplated in drafting the Raker Act.

It is also clear from the legislative debates that Congress intended that the Bay Cities be co-grantees, along with San Francisco, of the rights created by the Act:

"It has been stated that this bill is for the benefit of San Francisco alone. That also is incorrect. It expressly is for the benefit of all the cities about San Francisco Bay . . . ." (50 Cong.Rec. 3979 (1913) (remarks of Rep. Thomson).)

(*See also* 50 Cong.Rec. 3901, 4093, 4109, 5459, 5473, 5474 (1913); 51 Cong.Rec. 7 (1914); 50 Cong.Rec. 4101 (1913) ("Now, those who can participate under the bill would be the city and county of San Francisco and some 10 cities comprising the bay district outside of the city and county of San Francisco . . . ." (remarks of Sen. Raker)); *id.* at 3919 ("Mr. Chairman, San Francisco having taken the initiative in requesting the legislation now before the

**2.** *E. g.,* 50 Cong. Record 3919–3920 (1913): "What I desire to impress upon this House particularly is the fact that this grant is not for a single city, but for the entire bay region. Bordering upon San Francisco Bay are six counties, containing a total population in 1910 of 829,955, or 35 percent of the entire State. This population of the bay cities is rapidly increasing, for in California during the past decade the urban population increased two and a half times as rapidly as the rural. What will contribute to the growth of this particular locality is the fact that practically 80 percent of the arable land of California is tributary to this San Francisco Bay region.

"As these localities grow the development of all the near-by sources, including the supply of the Spring Valley system, the People's Water Co., and other small companies and private plants will fall far short of meeting the needs. This fact being generally recognized, the only question is as to the best and most available

future supply. I am convinced after going over the various and most exhaustive reports, including that of the advisory board of Government engineers, that the Hetch Hetchy is the most feasible and, in the long run, will be the most economical of the various projects proposed. Surely the valley could not be put to any higher beneficial use than to furnish the people of the bay cities with a bountiful supply of pure, fresh water." Remarks of Rep. Knowland, *id.* at p. 3920.)

**3.** The Bay Cities have lived up to the expectations of the drafters of the Raker Act. The Bay Cities claim that they have contributed to the initial acquisition and construction costs of the Hetch Hetchy system as well as to interest and sinking fund obligations through their payments for Hetch Hetchy water. They also assert that the San Francisco water system derives its sole support from the revenues paid for its services.

House granting certain rights on the part of the Government to enable that city to obtain an abundant and pure water supply is generally regarded as the principal if not the sole beneficiary under the proposed act. But there are other California cities as vitally interested, chief among these being the municipalities of Oakland, Berkeley, Alameda, Hayward, and San Leandro, situated directly across the bay from San Francisco and within the congressional district I have the honor to represent.") (remarks of Rep. Knowland).)

Section 8 of the Act defines a "grantee" as "the city and county of San Francisco and such other municipalities or water district or water districts as may, with the consent of the city and county of San Francisco or in accordance with the laws of . . . California, hereafter participate in or succeed to the beneficial rights . . . granted by this Act." While the Bay Cities are not expressly denominated as co-grantees without the consent of San Francisco, the legislative debates indicate that this omission does not alter the co-grantee characterization of the Bay Cities. Indeed, the drafters of the Act concluded that it would be redundant to designate the Bay Cities as co-grantees because the assumption in drafting the Act was that both San Francisco and the Bay Cities would share in the benefits of the Act. (*See* 50 Cong.Rec. 3922 (1913) ("The cities about the Bay of San Francisco have always approved the granting of the Hetch Hetchy Reservoir site to San Francisco, with the understanding that these cities may in the future join with the city of San Francisco in a metropolitan water district. The State law of California provides for the creation of a metropolitan water district, and because of this law the bay cities have not requested at this time to be made co-grantees. They know they will have the privilege to share in the benefits after San Francisco has made the necessary investment and brought the needed water to the bay cities for domestic use.") (reprint by Rep. Knowland of the analysis of Section 8 contained in House Report No. 41 which accompanied the Raker Act).) [4]

Appellant places much reliance on Section 9(u) and 10 of the Raker Act. Section 9(u) provides that if the grantee does not abide by the conditions of the grant, the Secretary of the Interior may ask the Attorney General to bring a suit to enforce them.[5] And Section 10 gives certain irrigation districts the right to commence a suit to enforce the rights granted them under the Act.[6] Invoking the maxim, *expressio unius est exclusio alterius,* appellant argues that Congress intended that no one other than the irrigation districts and the Attorney General may sue to enforce the Act. The argument is too simplistic. Courts have often recognized that the purposes in drafting a statute are controlling in its interpretation rather than the application of

**4.** Indeed, the inclusion of the consent provision in Section 8 was seen as a means by which the Bay Cities could opt out of the benefits and the burdens of the Act. (*See id.* at 3920 ("On the other hand, should the Alameda County cities be made joint grantees with San Francisco at this time, they would necessarily be immediately asked to assume certain responsibilities and carry their proportion of the financial obligations so far incurred. As it now stands it is optional. If they conclude that the Hetch Hetchy project offers the best and cheapest water supply they can unquestionably participate as separate municipalities or by organizing themselves into a municipal water district under the State act of December 21, 1911.").)

**5.** More specifically, Section 9(u) states, in part: ". . . That the grantee shall at all times comply with and observe on its part all the conditions specified in this Act, and in the event that the same are not reasonably complied with and carried out by the grantee, upon written request of the Secretary of the Interior, it is made the duty of the Attorney General in the name of the United States to commence all necessary suits or proceedings in the proper court having jurisdiction thereof, for the purpose of enforcing and carrying out the provisions of this Act."

**6.** Section 10 provides:
"That this grant, so far as it relates to the said irrigation districts, shall be deemed and held to constitute a binding obligation upon said grantee in favor of the said irrigation districts which said districts, or either of them, may judicially enforce in any court of competent jurisdiction."

convenient Latin formulae. (*See Matheson v. Armbrust* (9th Cir. 1960) 284 F.2d 670, 674 ("[I]t was noted that however helpful this and other rules of construction may be, the courts will nevertheless 'construe the details of an act in conformity with its dominant general purpose, will read text in the light of the context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.'"); *Amtrak, supra,* 414 U.S. p. 458, 94 S.Ct. p. 693 (". . . But even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent."); *Stewart v. Travelers Corp.* (9th Cir. 1974) 503 F.2d 108, 112 (". . . Recently . . . the tendency is to limit the *expressio unius* rule in favor of construing an act so as to effectuate its dominant purpose."); *Fagot v. Flintkote Co.* (E.D.La.1969) 305 F.Supp. 407, 411 (". . . It is an axiom of statutory interpretation that the purpose of a law furnishes the best guide to its application. It is no longer meet, . . . to attempt to construe a statute by the literal reading of its words, as if the statute were a tape measure to set beside a length of cloth. Statutes 'should be construed, not as theorums of Euclid, but with some imagination of the purposes which lie behind them.'").) The Bay Cities played a leading role among the *dramatis personae* in the passage of the Raker Act. Their support for the bill, their financial backing of the Hetch Hetchy facility and their growing demand for water were crucial factors in the passage of the Act. The legislative history and the language of the Act unmistakably reveal that the Bay Cities were intended to be equal beneficiaries with San Francisco of the Hetch Hetchy grant, and thus equally entitled to enforce the conditions to that grant.

We turn to the merits of the district court's grant of a preliminary injunction. The scope of our review is limited to the question whether the district court abused its discretion in granting a preliminary injunction. (*See* 7 Moore's Federal Practice ¶ 65.21 (2d ed. 1975) ("Where discretion is involved the test on appeal is whether the district court abused its discretion and not whether the appellate court would have granted or denied the injunction."); *Meccano, Ltd. v. John Wanamaker* (1920) 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822 (". . . Upon appeal, an order granting or denying . . . [a preliminary] injunction will not be disturbed unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion.").) Given the narrow confines of our review and the record before us, we cannot say that the district court abused its discretion in granting the Bay Cities a preliminary injunction.

Although we affirm the lower court's injunction of the proposed increases in Bay Area water rates, we are compelled to remand appellees' suit to enjoin the transfer of surplus funds from San Francisco's water department to its general fund. Appellees can challenge this transfer in federal court only by alleging that the transfer violates the Raker Act. More specifically, they must show that the water department's surplus was derived from the Hetch Hetchy grant. If the link exists, appellees can argue that the transfer of Hetch Hetchy revenue into a general fund that may only benefit San Francisco inhabitants violates the Raker Act as discriminatory against the Bay Cities. The record is presently inadequate to establish this necessary causal connection.[7] We must remand appellees' challenge to the proposed transfer for the limited purpose of determining

---

7. Appellees merely allege in their complaint that "the transfer of said funds result [sic] in a diversion of moneys realized from the sale of water" and that the proposed rate increase caused the San Francisco Board of Supervisors to determine that a surplus existed in its water department fund. Fortunately, appellant is less cryptic and states, in an affidavit of the water department's accountant, that the surplus is derived from the condemnation of water department lands for freeway purposes. (*See* n. 1, *supra.*) No information is provided as to whether Hetch Hetchy related lands were among those condemned. Thus, we cannot distill from the record the necessary relationship to the Hetch Hetchy grant that would give appellees a claim cognizable in federal court.

whether appellees have sufficiently shown a Raker Act violation; we construe the preliminary injunction to preserve the *status quo* during the proceedings on remand.

AFFIRMED IN PART AND REMANDED IN PART.