**Charles STARBUCK et al.,
Plaintiffs-Appellants,**

v.

**CITY AND COUNTY OF SAN FRANCISCO et al., Defendants-Appellees.**

No. 75–2213.

United States Court of Appeals,
Ninth Circuit.

June 28, 1977.

Richard M. Kaplan (argued), San Francisco, Cal., for plaintiffs-appellants.

Terry J. Houlihan (argued), San Francisco, Cal., Phyllis L. Hubbell (argued), Dept. of Justice, Washington, D. C., for defendants-appellees.

McMorris M. Dow, Deputy City Atty. (argued), for defendant-appellee City and County of San Francisco.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and EAST,* District Judge.

HUFSTEDLER, Circuit Judge:

The present appeal gives renewed vitality to the long-time dispute over the delivery of hydroelectric power from the Hetch Hetchy Valley to the Bay Area. Appellants, residents, taxpayers, and consumers of electricity in San Francisco, allege that San Francisco's present "wheeling" arrangement with the Pacific Gas and Electric Company violates Section 6 of the Raker Act of December 19, 1913, ch. 4, 38 Stat. 242, establishing the Hetch Hetchy Valley as a resource of water and electric power. Appellees are the City and County of San Francisco ["San Francisco"], Pacific Gas and Electric Company ["PG&E"] and the Secretary of The Interior ["the Secretary"]. The district court granted San Francisco's and PG & E's motion to dismiss for failure to state a claim because it concluded that the Raker Act did not create a private cause of action in favor of appellants. It also granted summary judgment in favor of the Secretary with respect to appellants' claims under the Administrative Procedure Act, 5 U.S.C. §§ 701, 702 (1967), and the mandamus statute, 28 U.S.C. § 1361 (1976). The district court determined that these claims were barred by the doctrine of sovereign immunity and were unreviewable decisions within the Secretary's discretion. We affirm the lower court's result, but we disagree with its reasoning.

Appellants' claims arise in the context of a unique statutory framework. The Raker Act opened the doors of the Hetch Hetchy Valley's abundant water and hydroelectric resources to the residents of the Bay Area. Many groups were involved in the drafting of this legislation including the Bay Cities, environmentalists, local water and utility companies, and California farmers and irrigation districts. The culmination of their efforts was a statute that creates a delicate balance between federal interests in the use of federal public lands and state interests in the supply and distribution of water and energy to its citizens. Although appellants' Raker Act allegations raise a potpourri of complex federal jurisdictional issues,[1] we need not decide them because the Raker Act does not create a private cause of action in favor of appellants.

The Raker Act does not expressly authorize consumers and residents of San Francisco to enforce its provisions. This omission does not foreclose the implication of a private cause of action. The Supreme Court has recently considered the question of the propriety of implying a private cause

---

* Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

1. *E. g.*, Do the appellants have standing to challenge an alleged violation of the Raker Act? If so, have they sufficiently alleged the requisite jurisdictional amount for federal question jurisdiction? (*See* 28 U.S.C. § 1331 (1977).)

of action in *Nat'l Railroad Passenger Corp. v. Nat'l Ass'n. of Railroad Passengers* ["Amtrak"] (1974) 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (suit to enjoin discontinuance of allegedly uneconomic routes under the Rail Passenger Act of 1970), and its progeny. (*See, Securities Investor Protection Corp. v. Barbour* ["SIPC"] (1975) 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (suit to compel SIPC to provide financial relief to customers of failing broker-dealer); *Cort v. Ash* (1975) 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (stockholder damages action against corporate directors for making illegal campaign contributions); *Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (10b–5 suit for damages brought by nonpurchaser or seller of securities).) The language in these cases, while suited to the statutory schemes therein involved, provides an ill-fitting pattern against which to measure the provisions of the Raker Act. Unlike the administrative schemes involved in those cases, the Raker Act's administration depends on a finely-tuned interplay of the Secretary's discretion [2] and a balance of state and federal control over the use of Hetch Hetchy water and power.[3] *Cort v. Ash, supra*, provides the most appropriate,

**2.** Illustrative of the Secretary's discretion under the Raker Act are:

Section 1: ". . . [t]hat there is hereby granted to the city and county of San Francisco, a municipal corporation in the State of California, all necessary rights of way along such locations and such width, not to exceed two hundred and fifty feet, as in the judgment of the Secretary of the Interior may be required for the purposes of this Act, in, over, and through the public lands of the United States . . . ."

Section 2: "[t]hat within three years after the passage of this Act said grantee shall file with the registers of the United States land offices, in the districts where said rights of way or lands are located, a map or maps showing the boundaries, locations, and extent of said proposed rights of way and lands required for the purposes stated in section one of this Act; but no permanent construction work shall be commenced on said land until such map or maps shall have been filed as herein provided and approved by the Secretary of the Interior[.]"

Section 9(e): "[t]hat such minimum and maximum amounts of such stored water to be so released during any calendar year as hereinbefore provided and the price to be paid therefor by the said irrigation districts are to be determined and fixed by the Secretary of the Interior in accordance with the provisions of the preceding paragraph."

Section 9(n): "[t]hat after the period of twenty years hereinbefore provided for the development, transmission, use, and sale of electric power, the Secretary of the Interior, under authorization hereby given, may require the grantee, within a time fixed by the Secretary, to develop, transmit, and use, or offer for sale, such additional power, and also such power less than sixty thousand horsepower as the grantee may have failed to develop, transmit, use, or sell, within the twenty years aforesaid, as in the judgment of said Secretary the grantee may or ought to develop under this grant, and which in his judgment the public interest demands or convenience requires; and in case of the failure of the grantee to carry out any such requirements of the Secretary of the Interior the latter is hereby authorized so to do, and he may, in such manner and form and upon such terms and conditions as he may determine, provide for the development, transmission, use, and sale of such additional power and such power not so developed, transmitted or used by the grantee at the end of said twenty years up to sixty thousand horsepower; and for that purpose the Secretary of the Interior may take possession of and lease to such person or persons as he may designate such portion of the rights of way, structures, dams, conduits, and other property acquired or constructed by the grantee hereunder as may be necessary for the development, transmission, use and sale of such power."

**3.** State sovereignty versus federal control over public lands was one of the dominant subjects of debate during Congressional consideration of the Act. (*See*, 51 Cong.Rec. 288 (1913) (". . . We are about to establish the precedent that a proprietor of public lands can make a grant and in the execution of that grant send a Federal officer into a sovereign State to fix the prices which a public-utility corporation or a municipal corporation shall charge to its citizens . . . .") (remarks of Sen. Borah).); *id.* at 290 ("[D]oes the Senator then contend that the contract between the city of San Francisco and the Federal Government should control the policy of the State of California?") (remarks of Sen. McCumber).); *id.* at 356 ("Thus it is said that a power of disposition of these waters is put into the hands of the Secretary of the Interior. He is charged, . . . with determining what amount should be paid for these waters, and the power is taken away from the State of California or from its water commission.") (remarks of Sen. Walsh).).)

albeit imperfect standard[4] to apply to the question of an implied cause of action under the idiosyncratic Raker Act. In *Cort v. Ash*, the Court stated the following criteria: ". . . First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" (422 U.S. at 78, 95 S.Ct. at 2088.)

Appellants' basic complaint is that San Francisco's use of PG&E's transmission lines to deliver Hetch Hetchy power to its residents violates Section 6 of the Raker Act.[5] They contend that they satisfy the first criterion in *Cort v. Ash* because they are the direct beneficiaries of the prohibitions of Section 6. More specifically, appellants note that Section 6 was intended to establish the Hetch Hetchy power resource as a competitor of private monopolistic suppliers of electric power to the Bay Area. Given this introduction of competition, elec-

tric rates would decrease for Bay Area consumers. Appellants find verbal nourishment for their position from a prior battle in the courts over the Hetch Hetchy grant. In *United States v. City and County of San Francisco* (1940), 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050, the Court held that Section 6 requires the "sale and distribution of Hetch Hetchy power exclusively by San Francisco . . . directly to consumers in the belief that consumers would thus be afforded power at cheap rates in competition with private power companies, particularly Pacific Gas & Electric Company." (*Id.* at 26, 60 S.Ct. at 755.) The case documents Congress' intent in drafting the Raker Act to free San Francisco residents from the "galling bondage to a merciless taskmaster" and the "thralldom . . . [of] a remorseless private monopoly." (50 Cong.Rec. 4110 (1913) (remarks by Rep. Bailey).) (*See,* 310 U.S. at 22, 60 S.Ct. 749. ("From the congressional debates on the passage of the Raker Act can be read a common understanding both on the part of sponsors of the Bill and its opponents that the grant was to be so conditioned as to require municipal performance of the function of supplying Hetch-Hetchy water and electric power directly to the ultimate consumers, and to prohibit sale or distribution of that power and water by any private corporation or individual." (footnote omitted).); and 51

---

**4.** The Supreme Court recently applied the criteria of *Cort v. Ash* to consider whether an unsuccessful tender offeror has a private cause of action for damages under Section 14(e) of the Williams Act. (*See, Piper v. Chris-Craft Industries* (1977) 430 U.S. 1, pp. 37–41, 97 S.Ct. 926, pp. 947–949, 51 L.Ed.2d 124 (1977).) The Ninth Circuit has also espoused the *Cort v. Ash* test in *Harmsen v. Smith* (9th Cir. 1976) 542 F.2d 496. (*See also, Rauch v. United Instruments, Inc.* (3d Cir. 1976) 548 F.2d 452 (Aircraft owner has no private cause of action under Federal Aviation Act against manufacturer and distributor of defective altimeter.); *Lloyd v. Regional Transportation Authority* (7th Cir. 1977) 548 F.2d 1277 (Application of *Cort v. Ash* to determine whether the handicapped have a cause of action against mass transportation system under the 1973 Rehabilitation Act.); *Abrahamson v. Fleschner* (2d Cir. 1977) [45 U.S.L.W. 2435] (same with respect to private cause of action in limit-

ed partners under Investment Act of 1940); *Sierra Club v. Morton* (N.D.Cal.1975) 400 F.Supp. 610, 622; *Miller v. Mallery* (D.Or.1976) 410 F.Supp. 1283; *De Jesus Chavez v. LTV Aerospace Corp.* (N.D.Tex.1976) 412 F.Supp. 4.)

**5.** Section 6 of the Raker Act provides: "[t]hat the grantee is prohibited from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it or him by the said grantee: *Provided,* That the rights hereby granted shall not be sold, assigned, or transferred to any private person, corporation, or association, and in case of any attempt to so sell, assign, transfer, or convey, this grant shall revert to the Government of the United States."

Cong.Rec. 343–47 (1913) (remarks of Sen. Norris) [6].)

The fact that Congress may have included the inhabitants of San Francisco among the beneficiaries of the Act does not imply that Congress intended to create a private cause of action in favor of those inhabitants. The legislative history of the Act reveals a careful consideration of the enforcement mechanism for the many conditions in the Hetch Hetchy grant. The primary concern of the debates was the relationship of the Federal Government *vis-a-vis* the State of California. That is, how should the Federal Government ensure that California would comply with the conditions to its grant of federal lands? Many congressmen suggested that an automatic forfeiture provision should be included in the grant. (*See,* 50 Cong.Rec. 4103–04 (1913).) But the suggestion was rejected as too harsh. (*See, id.* at 4105 ("[F]or heaven's sake, let us not add a clause so that if a horse takes a drink out of a creek or some one uses a little water or does something it

may afford an excuse for some superserviceable United States attorney to jump in and declare forfeiture." (remarks by Rep. Taylor).).) The compromise that evolved was an amendment offered by Senator Raker himself which became Section 9(u) of the Act. That section provides that the Attorney General, at the request of the Secretary, may commence suit to enforce the Act if the grantee violates any of the conditions to the grant.[7] An eleventh hour amendment offered by Representative Mondell, an opponent of the bill, which would have given "any party in interest" a right to enforce the Act [8] was rejected with little debate. (*See,* 50 Cong.Rec. 3986–88 (1913).) [9]

Parallel to the legislative development of Section 9(u) was the concern over the protection of the pre-existing rights of certain irrigation districts. (*See,* 51 Cong.Rec. 297 (1913) (remarks by Sen. Borah); 50 Cong. Rec. 4109–11 (1913).) Section 10 of the Act [10] was thus included to give those irri-

---

6. Senator Norris was moved to deliver some melodramatic invocations to his brethren:

"Hold up your calloused hands, you senatorial strap hangers, who for years have been riding on cars here and paying for something you did not get. Hold up your hands, and if you cannot give relief to the citizens of the District of Columbia from an intolerable situation, at least let your brethren out on the coast get some relief. Defeat this bill and you will receive the plaudits, the acclaim, and the praise of every hydroelectric corporation in the State of California. Pass it and you give into the hands of the people a power that God intended should do some good for man.

"Pass this bill and you relieve the burden of every man on that coast who earns his living by the sweat of his face. Pass it and you give relief to every woman who toils, to every child who suffers. You start countless wheels revolving that will relieve humanity of its present burdens and make them lighter. You give it cheaper power, cheaper light, cheaper heat, cheaper transportation, and an abundance of pure water." (51 Cong.Rec. at 347 (1913).)

7. Section 9(u) provides, in part:

"[t]hat the grantee shall at all times comply with and observe on its part all the conditions specified in this Act, and in the event that the same are not reasonably complied with and carried out by the grantee, upon written request of the Secretary of the Interior, it is made the duty of the Attorney General in the name of the United States to commence all necessary

suits or proceedings in the proper court having jurisdiction thereof, for the purpose of enforcing and carrying out the provisions of this Act."

8. Representative Mondell offered the following amendment:

"(g) That the conditions of the grant made herein shall be enforceable, and the rights . . . of said grant may be cancelled . . . upon the failure on the part of the grantee to comply with the . . . conditions thereof, on notice by the Secretary of the Interior, in accordance with the judgment of any court of competent jurisdiction in a suit brought by the United States or any party in interest." (50 Cong.Rec. 3986 (1913).)

9. At that time, Representative Kent, exhibiting prescience, remarked, "[w]e do not want to let a lot of other claims come in here and stop this matter by a process of litigation. We want everybody recognized that is now recognized under the California law, but we do not want the whole business stopped by an interminable litigation of people whose claims we do not now know." (50 Cong.Rec. 3987 (1913).)

10. Section 10 states:

"That this grant, so far as it relates to the said irrigation districts, shall be deemed and held to constitute a binding obligation upon said grantee in favor of the said irrigation dis-

gation districts a specific cause of action to enforce their rights. At this juncture, Representative Mondell concluded that the enforcement provisions in the Act ruled out any other private cause of action:

"Now, there are conditions in this bill in which various parties will be interested; individuals, corporations, water districts, municipalities, and everybody in interest ought to have an opportunity to get into court and compel the enforcement of the provisions. The amendment offered by . . . [Mr. Raker] unfortunately would preclude or attempt to preclude them. So far as it has any force to prevent any party in interest from bringing suit unless they could persuade the Secretary of the Interior to bring a suit in their behalf it is wrong." (*Id.* at 4109.)

Appellants discount Representative Mondell's comments by arguing that his remarks arose in the context of an automatic forfeiture proposal; and as such, do not indicate any congressional intent to preclude their cause of action. The argument gives too little significance to Representative Mondell's assertions. While automatic forfeiture was considered as a device to enforce the Act, it was only one of several such devices. Senator Raker's amendment represents a compromise in light of all the possible means of enforcing the Act that were considered.[11] Representative Mondell's remarks were not merely a response to the automatic forfeiture proposal, but also to the administrative scheme ultimately chosen by Congress; *i. e.*, Sections 9(u) and 10. The second criterion in *Cort v. Ash* thus denies the implication of a cause of action in favor of appellants.

Appellants' averments, read in the light of historical events that followed the passage of the Raker Act, reveal that appellants cannot meet the third and fourth criteria of *Cort v. Ash*. In 1913, Congress anticipated that San Francisco would shortly build its own transmission lines and that direct service to consumers would provide consumers with abundant power more cheaply than that supplied by private utilities. The congressional assumptions might have come true had the taxpayers seen it Congress' way in the decades that followed the Raker Act. But the taxpayers repeatedly refused to approve bond issues that would have supplied the revenue to build the transmission facilities.[12] In the meantime, energy shortages, inflation and escalating costs of rights of way, of construction, and of the debt service have obliterated Congress' rosy vision of San Francisco's energy future. Even if we could reasonably assume that Bay Area taxpayers would now be willing to assume the debt burden to build these facilities, we cannot infer that energy delivered over those newly constructed lines would be cheaper than energy delivered over PG & E's lines. The rate structure for direct delivery would necessarily reflect the enormous costs involved in building the system. If any inference would be permissible, it would be that the cost of energy to the consumers would be more, not less, than that available under the present wheeling arrangements. In short, the dominant cheaper energy purpose of the Raker Act would be defeated, rather than fulfilled, if appellants were to be given the remedy they seek.

 Of perhaps greater moment, the Act establishes a cooperative effort of the

---

tricts which said districts, or either of them, may judicially enforce in any court of competent jurisdiction."

11. In response to Representative Mondell's remarks, Representative Mann said, "[t]he gentlemen on the Committee on Public Lands themselves . . . have executed the most skillful straddle that I have ever seen . . . . [A]s they have come to this compromise, and on the whole have given away nobody's case, I do not see how anyone can take exception to it[.]" (50 Cong.Rec. at 4110.)

12. *See*, Affidavit of Richard K. Pelz, Assistant Solicitor for the Department of The Interior, (Clerk's Record, p. 274), noting that on November 4, 1941, San Francisco voters turned down a proposal to purchase PG & E's facilities. *See also*, Report of the Grand Jury of San Francisco (1973) (*id.* at p. 33) ("There have been previous attempts at a general obligation bond issue to purchase PG & E's distribution facilities, the last being in 1941 . . . .").

United States, acting through the Secretary, and the State of California in providing water and power to Bay Area inhabitants. Interpretation of the Raker Act and the use of federal lands is not an area "traditionally relegated to state law," but the Act's regulation of water and power delivery solely within the State of California legislates in an "area basically the concern of the States." As such, it speaks against implying a federal cause of action under the fourth criterion in *Cort v. Ash.* We are not insensitive to the appellants' concern that the Raker Act may have been violated, but we cannot ignore our duty under *Cort v. Ash.* Our weighing of the factors in that case necessitates our holding that appellants have no cause of action under the Raker Act.[13]

■ Appellants alternatively seek review under the Administrative Procedure Act ["APA"], which provides that a person "adversely affected or aggrieved by agency action within the meaning of a relevant statute" (5 U.S.C. § 702 (1967)) may seek judicial review of the agency action, unless such review is expressly precluded by statute or the "agency action is committed to agency discretion by law." (*Id.* at § 701(a).) Appellants claim that they are entitled to APA review of the Secretary's decision not to commence a suit against San Francisco under the enforcement powers given him by Section 9(u) of the Act. Appellants rely on the holding in *United States v. City and County of San Francisco, supra,* to allege that San Francisco is violating Section 6 of the Act and that the Secretary has no discretion; he has solely the duty to enforce the conditions in Section 6.[14]

■ Despite the sympathetic appeal of appellants' claim, appellants cannot prevail. They are not within the class of persons encompassed by the term of art, "a person aggrieved." The concept of "a person aggrieved" is a close relative of the doctrine of standing. (*See Ass'n of Data Processing Organizations, Inc. v. Camp* (1970) 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; *Sierra Club v. Morton* (1972) 405 U.S. 727, 731–32,

**13.** Appellants' reliance on the district court's decision in *City of Palo Alto v. City and County of San Francisco* (N.D.Cal.1974) aff'd in part and rem. in part (9th Cir. 1977) 548 F.2d 1374, is misplaced. The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another. (*See,* 1B Moore's Federal Practice ¶ 0.402[1], p. 61 (2d ed. 1947) (". . . Thus a decision of one district court is not binding upon a different district court.").) Appellants' invocation of collateral estoppel is also of no avail. That doctrine requires a prior final judgment (*see, id.* at ¶¶ 0.401, 0.441[2]), but granting a preliminary injunction in the *Palo Alto* case is not a final judgment sufficient for collateral estoppel purposes. (*Id.* at ¶ 0.409[1].)

Appellants' reliance on the alleged *res judicata* effect of the Supreme Court's judgment in *United States v. City and County of San Francisco, supra,* is also misplaced. Without expressing any opinion on the merits of appellants' Raker Act claim, it is sufficient to say that the present case is not an effort to relitigate the cause of action adjudicated in that case. (*See,* 1B Moore's Federal Practice at ¶ 0.410[1].)

**14.** The district court incorrectly dismissed appellants' claims under the APA and the mandamus statute, 28 U.S.C. § 1361 (1976), as barred by the doctrine of sovereign immunity. That doctrine does not bar a suit against a federal officer where it is alleged that the officer acted beyond the scope of the authority given him by statute. (*See, Dugan v. Rank* (1963) 372 U.S. 609, 621–22, 83 S.Ct. 999, 10 L.Ed.2d 15; *Larson v. Domestic and Foreign Commerce Corp.* (1949) 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 ("There may be . . . suits for specific relief against officers of the sovereign[.] . . . [W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions."); *Rockbridge v. Lincoln* (9th Cir. 1971) 449 F.2d 567, 573 ("[F]or the purposes of sovereign immunity, this court can see no valid distinction between the public official who has a statutory duty to act and does not and the one who has a duty not to act and does.").)

Appellants could more clearly have stated the precise nature of their claim under the APA. Certainly, appellants are not alleging that the Secretary has completely failed to enforce the conditions of the Hetch Hetchy grant. The Secretary himself stated in his motion for summary judgment that, among other things, he receives quarterly reports from his staff as to San Francisco's compliance with the Act and the order in *United States v. City and County of San Francisco, supra.* Nevertheless, appellants' allegations are sufficient to remove the bar of sovereign immunity.

92 S.Ct. 1361, 31 L.Ed.2d 636; Hart and Wechsler, *The Federal Courts and the Federal System*, pp. 178–80 (2d ed. 1973). Claimants cannot be persons aggrieved unless "the challenged action had caused them 'injury in fact,' . . . [and] the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." (*Sierra Club v. Morton, supra,* at p. 733, 92 S.Ct. at p. 1365 (footnote omitted).)

Assuming, *arguendo,* that appellants can satisfy the "zone of interests" test as consumers of electric energy, they cannot allege an "injury-in-fact." Appellants claim that they have been injured by the Secretary's refusal [15] to enforce Section 6 because their electricity rates would be lower if San Francisco did not use PG & E facilities to transmit Hetch Hetchy power.[16] Although appellants may be injured by an increase in their utility rates, appellants must still show that the remedy they seek would cure the injury of which they complain. (*See, Warth v. Seldin* (1975) 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (". . . When a governmental prohibition . . . imposed on one party causes specific harm to a third party, harm that a . . . statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. . . . But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm."); *Simon v. Eastern Kentucky Welfare Rights Organization* (1976) 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 ("[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." (footnote omitted).).)

Appellants have not made any showing that their rates would decrease if they were successful in this action. For the reasons that we have previously stated, we do not believe that the essential showing can be made. "Plaintiffs may not rely on 'the remote possibility, unsubstantiated by allegations of fact, that their situation . . . might improve were the court to afford relief.'" (*Bowker v. Morton* (9th Cir. 1976) 541 F.2d 1347, 1349.)

Similarly, appellants cannot show the essential causal link between their injury and the Secretary's alleged inaction. As the Supreme Court has recently said: "[T]he

---

**15.** Appellants wrote a letter to then Secretary Morton informing him of a Grand Jury report that concluded that San Francisco's contract with PG & E violated Section 6 of the Raker Act and the order in *United States v. City and County of San Francisco.* The Secretary responded that he doubted the merits of the Grand Jury's conclusions because the present contract with PG & E differs from that involved in the prior Supreme Court case.

**16.** Appellants aiso allege that they are injured by the Secretary's refusal to enforce the priority list for the sale of excess Hetch Hetchy power laid out in Section 9(*l*) of the Act. They argue that Section 9(*l*) requires that excess energy be first offered to San Francisco inhabitants. Because Hetch Hetchy energy is cheaper than PG & E's thermally produced energy, appellants aver that their rates would be lower if they would receive more Hetch Hetchy energy versus PG & E power. There second injury, therefore, is a species of the one first alleged— injury due to higher electricity rates caused by the Secretary's lack of enforcement of the Raker Act.

Appellants state a third injury derived from the Secretary's acts. Namely, they allege that because a future Secretary might seek a reversion of the entire Hetch Hetchy grant for breach of the Act's conditions, appellants' rates would increase if they would have to rely totally on PG & E power. This claim raises serious questions of ripeness and is too speculative upon which to base standing under the APA. (*See, Warth v. Seldin* (1975) 422 U.S. 490, 509, 95 S.Ct. 2197, 45 L.Ed.2d 343 (" 'of course, pleading must be something more than an ingenious academic exercise in the conceivable.' "); *Simon v. Eastern Kentucky Welfare Rights Organization* (1976) 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 ("[U]nadorned speculation will not suffice to invoke the federal judicial power.").)

'case and controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." (*Simon v. Eastern Kentucky Welfare Rights Organization, supra,* at pp. 41–42, 96 S.Ct. at p. 1926.) (*See also, Warth v. Seldin, supra,* at p. 509, 95 S.Ct. 2197; *Bowker v. Morton, supra,* at p. 1349 (". . . Compactly put, the test for standing . . . is that the plaintiffs must have alleged (a) a particular injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought." (footnote omitted).); *Harrington v. Bush* (D.C. Cir. 1977), 180 U.S.App.D.C. 45, 553 F.2d 190, 205–206, n. 68.) We cannot ignore the reality that the consumers' costs of energy are far more attributable to national and international forces of supply and demand than they are to the Secretary's actions and omissions in respect of Hetch Hetchy power. Nor do we have any basis to assume that appellants' energy woes will be cured by the remedy that appellants ask us to compel.

Our holding does not foreclose all avenues of relief from the Secretary's alleged inaction or from the claimed violation of the Raker Act. As we have seen in the *Palo Alto* case (9th Cir. 1977) 548 F.2d 1374, the Bay Cities may bring suit to enforce the Act if they otherwise present a justiciable claim.[17] Appellants have made out what, at best, can be described as a tenuous allegation of "injury in fact." While that minimal showing might provide standing sufficient to challenge administrative action under another statutory scheme, it will not suffice under the Raker Act. Almost every section of that Act evidences the uneasy federal-state partnership controlling water and power delivery within California. Draftsmen of the Act established this delicate alliance and created a balance between federal and state control. To allow appellants to interfere with this schema on the basis of a minimal showing of injury would unnecessarily endanger the fragile structure that Congress built in the Raker Act.[18]

AFFIRMED.

17. In this way, the present case differs from *Washington Utilities & Transportation Comm'n v. Federal Communications Comm'n* (9th Cir. 1975) 513 F.2d 1142, where we held that the Washington Utilities Commission had standing to contest FCC approval of new interstate carrier routes. Because (1) interstate and intrastate telephone service used the same lines; (2) the costs of those lines were allocated between inter- and intrastate use; and (3) the addition of new interstate lines would decrease the use of interstate service over these lines, the Utilities Commission argued that the price of intrastate service would increase. Since the Utilities Commission was charged with the protection of the cost and quality of telephone services in Washington, we held that it had sufficiently alleged that it was aggrieved. Important to our holding in that case was the fact that the Utilities Commission was probably the only entity who could challenge the agency action. ("[A]llowing such agencies standing may often be the only practical means of effectuating Congress' declaration that judicial review of particular federal agency action is appropriate. In the present case . . . any adverse impact of the FCC order . . . would probably be so indirect . . . that

individual users of intrastate telephone service would be unaware of it, or . . . would have inadequate incentive to incur the expense of judicial review." *Id.* at 1152.)

18. Appellants claim that they are entitled to a hearing on the Secretary's decision not to sue San Francisco for violation of the Raker Act. Assuming that someone is entitled to some sort of hearing, appellants are not the ones. They have not shown what benefit they would derive from a hearing since they have no cause of action to sue under the Act or to bring a suit under the APA. And appellants certainly cannot allege injury to the rights of third persons.

Appellants' claim for relief under the mandamus statute, 28 U.S.C. § 1361 (1976), is equally unfounded. That statute does not provide an independent ground for jurisdiction (*see,* Wright, *Handbook of the Law of Federal Courts,* p. 84 (3d ed. 1976)). Since appellants have failed to make out a claim under the Raker Act, and lack sufficient standing to invoke the APA, they cannot avail themselves of the more extraordinary mandamus remedy.