[No. A127554. First Dist., Div. Five. May 31, 2012.]

PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff, Cross-defendant and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant, Cross-complainant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B.

898

## COUNSEL

Law Office of Ted W. Pelletier, Ted W. Pelletier; Clifford J. Gleicher, Kelly J. Lack and Alejandro Vallejo for Plaintiff, Cross-defendant and Appellant.

Dennis J. Herrera, City Attorney, Theresa L. Mueller, James M. Emery and William K. Sanders, Deputy City Attorneys, for Defendant, Cross-complainant and Appellant.

## OPINION

**BRUINIERS, J.**—For over 80 years, the City and County of San Francisco (City) has generated electric power at its Hetch Hetchy hydroelectric project in the Sierra Nevada. The City's power transmission lines, however, reach only to the City of Newark. Pursuant to contract, Pacific Gas and Electric Company (PG&E) transmits City-generated electricity the remaining distance to San Francisco and distributes it locally. The contract distinguishes electricity to be used for municipal purposes (Municipal Load) and electricity to be used for commercial purposes, for which PG&E generally has the right to bill the end user. The Ferry Building, a property owned and originally largely occupied by the Port of San Francisco, was mutually agreed to be Municipal Load. This dispute arose after the Ferry Building was renovated in 2003. PG&E contended that the use of the building had materially changed and that the account no longer qualified as Municipal Load. PG&E filed this action seeking declaratory relief and breach of contract damages.

On cross-motions for summary adjudication, the trial court agreed that the postrenovation account was no longer Municipal Load and granted declaratory relief in favor of PG&E. In a separate bench trial, however, the court rejected PG&E's damage claim for breach of contract, finding that PG&E had sued under the wrong contract and that it had failed to present a claim to the City under the correct agreement as required by the Government Code. In the published portion of this opinion, we affirm the ruling that the postrenovation account no longer qualified as Municipal Load. In the unpublished portion of

our opinion, we reverse the ruling on the breach of contract claim, vacate the judgment and remand to the trial court for reconsideration of PG&E's claim for damages.

## I. FACTUAL AND LEGAL BACKGROUND

In the 1920's, the City began generating electricity at the Hetch Hetchy hydroelectric project in the Sierra Nevada. The City uses its own transmission lines to bring power from Hetch Hetchy to the City of Newark. However, the residents of San Francisco never approved funding for transmission lines between Newark and San Francisco or distribution lines within San Francisco, so the City contracts to use PG&E's lines for that purpose. The City's use of Hetch Hetchy power is governed by the 1913 federal Raker Act. (See Pub.L. No. 63-41 (Dec. 19, 1913) 38 Stat. 242; hereafter Raker Act.) The City's transmission of electricity over PG&E's lines is governed by several contracts between the City and PG&E. For these purposes, "the City" includes the Port of San Francisco (Port), which manages City property on the San Francisco harbor, including the Ferry Building.

*The Raker Act*

Congress granted the City rights of way in the Stanislaus National Forest and Yosemite National Park to build, operate and maintain the Hetch Hetchy hydroelectric project. (See Raker Act, § 1.) The parties agree that the Raker Act "defines and limits the uses that the City may make of the electricity that it generates at Hetch Hetchy."

Section 9(*l*) of the Raker Act requires the City to sell excess electricity from the Hetch Hetchy project to the Modesto and Turlock Irrigation Districts and municipalities within those districts for certain purposes at cost. Electricity is defined as "excess" if it is more than what the City needs to pump its own water supply and "for the actual municipal public purposes of [the City] (which purposes shall not include sale to private persons or corporations)." (*Ibid.*) Once the City has provided excess electricity to satisfy designated needs of the irrigation districts and associated municipalities, "it may dispose of any [additional] excess electrical energy for commercial purposes."[1] (Raker

---

[1] Other sections acknowledge that the City may use Hetch Hetchy power under certain conditions for "municipal or commercial use." (See, e.g., Raker Act, § 9(m) ["the right . . . to develop electric power for either municipal or commercial use . . ."].)

Section 9(m) of the Raker Act provides that the City "shall develop and use hydroelectric power for the use of its people and shall, at prices to be fixed under the laws of California . . . sell or supply such power for irrigation, pumping, or other beneficial use, said prices not to be less than will return to [the City] the actual total costs of providing and supplying said power . . . ." As suggested by this language, Congress expected the Raker Act to lead to the City's direct sale of electricity to the residents of San Francisco in competition with a private utility. (See *U. S. v. San Francisco* (1940) 310 U.S. 16, 22-26 [84 L.Ed. 1050, 60 S.Ct. 749] (*U.S. v. SF*); *City and County of San Francisco v. United Airlines* (9th Cir. 1979) 616 F.2d 1063,

Act, § 9(*l*).) Section 6 of the Raker Act prohibits the City "from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the . . . electric energy sold or given to it or him by the [City]."

*The 1987 Interconnection Agreement*

The City contracted with PG&E to transmit and distribute the City's power from Newark to San Francisco and other locations in several "Interconnection Agreements."[2] In the parties' 1945 Interconnection Agreement, PG&E agreed to transmit power that the City required " 'for its own municipal purposes,' " which were defined by illustration through such examples as " 'a street railway system' " and " 'lighting City streets.' " The agreement specified that the term did " 'not include resale except as mutually agreed by the parties.' "

In 1987, the parties entered into a new Interconnection Agreement (the IA).[3] Pursuant to the IA, PG&E is required to sell and provide the City with

---

1068, fn. 4 (*United Airlines*).) However, San Francisco taxpayers refused to approve bonds for the development of a transmission system and that expectation never came to fruition. (*United Airlines*, at p. 1068, fn. 4; *Starbuck v. City & County of San Francisco* (9th Cir. 1977) 556 F.2d 450, 456 (*Starbuck*).) "[T]he people now obtain their power from P.G. & E." (*United Airlines*, at p. 1068, fn. 4.)

Section 9(*o*) of the Raker Act provides, "[T]he rates or charges to be made by [the City] . . . for the use of power for commercial purposes shall at all times conform to the laws of the State of California . . . ." In a 1979 decision, the Ninth Circuit held that section 9(*o*) of the Raker Act, which governs sales of power "for commercial purposes," applied to the City's sales of "surplus power"—i.e., power "in excess of that needed for municipal purposes or dedicated under certain mandatory provisions of the Raker Act"—to airport tenants, Norris Industries, and certain industrial customers. (*United Airlines, supra*, 616 F.2d at pp. 1065–1066.) The court also held that section 9(*o*) applied to the City's sales of surplus power to the irrigation districts, i.e., power over and above what the City was obligated to sell those districts (and the municipalities within the districts) at cost under section 9(*l*) of the Raker Act. (616 F.2d at pp. 1065, 1068–1069.) *United Airlines* thus implicitly holds that these sales of power to airport tenants, Norris Industries and the districts (at more than cost) were for "commercial" purposes within the meaning of the Raker Act.

[2] The Interconnection Agreements are also known as "wheeling" agreements. (*Starbuck, supra*, 556 F.2d at p. 452.) Before the first Interconnection Agreement was signed in 1945, the City "entered into an agreement with PG&E whereby the utility would take a portion of the Hetch Hetchy power, sell it to PG&E's customers, and pay San Francisco the revenues it received for the power." (U.S. Dept. of the Interior, mem. (Nov. 10, 1988) p. 3 [internal memorandum from Solicitor to Secretary regarding City's compliance with Raker Act]; hereafter, Department Interior Memorandum.) In a 1940 opinion, the United States Supreme Court held the agreement violated section 6 of the Raker Act because under the agreement the City effectively sold PG&E the right to resell Hetch Hetchy power. (*U.S. v. SF, supra*, 310 U.S. at pp. 27–28.) Thereafter, the City and PG&E entered into the Interconnection Agreements, and the Department of the Interior ultimately determined that those agreements complied with the Raker Act. (Dept. Interior Mem., *supra*, at pp. 4–7, 13.)

[3] The parties entered into yet another Interconnection Agreement in 2007, but they have stipulated here that the new agreement "did not amend any of the provisions of the 1987 IA

power and other services, including transmission and distribution services that, the City needs to meet its Municipal Load and "Firm Resale Load." (IA, § 2.1.) PG&E's obligations are expressly *limited* "to the extent such services support City's Municipal Load and Firm Resale Load." (IA, § 2.7.3.) Municipal Load is defined as "[p]ower required for City's municipal public purposes pursuant to the Raker Act, as may be designated by the City, both inside and outside of City. For purposes of this Agreement, such load shall not include load served by City as resale load." (IA, § 1.43.) Firm Resale Load is defined as "City's contractual commitment to meet Firm Obligations to Districts and to provide Firm Power to Airport Tenants and Riverbank." (IA, § 1.26.) "Firm Obligations to Districts" refers to the City's obligations to provide power to the Modesto and Turlock Irrigation Districts; "Airport Tenants" are the "tenants at the San Francisco International Airport whose electric service is purchased at retail from City, and their respective loads"; and "Riverbank" is "Riverbank Army Ammunition Plant, a resale customer of City located in Riverbank, California, that is owned by the United States Department of Defense and operated by Norris Industries or its successor."[4] (IA, §§ 1.16, 1.2, 1.57.) The IA also contains an arbitration clause. (IA, § 9.29.2.)

---

that are relevant to this action." Thus, the IA signed in 1987 is the operative agreement for purposes of this action and we need not discuss the 2007 agreement further.

[4] Consistent with the Raker Act, section 2.7.1 of the IA provides that electricity generated by the City's Hetch Hetchy plants shall be used first to serve the City's Municipal Load and second to serve its Firm Obligations to Districts. IA section 2.7.2 provides that "Excess Energy" generated by the City's plants "shall serve the following loads in order of priority": (1) "Airport Tenants and Districts"; (2) "Riverbank"; (3) "Other sales of Excess Energy"; (4) "Assigned Customers"; and (5) "Deferred Delivery Account." The IA states that the last two categories are accommodations to allow the City to use all of the energy it generates at Hetch Hetchy.

Hetch Hetchy Water and Power (HHWP) described its electrical service in a 1995 "Power Revenue Enhancement Study" (HHWP Revenue Study) as follows: "HHWP first serves [City] municipal load . . . . The remaining quantity is distributed to the Districts, with first priority accorded 'Class 1' loads (aka 'Raker Act Power') which, in accordance with the Raker Act, is sold at cost. The balance . . . is sold to the Districts as 'Class 3 Power' at wholesale rates. [¶] At certain times of the year, especially during spring runoff season, HHWP generates power in excess of [its dependable capacity]. The Districts have first right of refusal on excess power, except that 50% of all such excess power may be used to serve HHWP's two retail customers: tenants of the San Francisco International Airport and the U.S. Army Ammunitions Plant in Riverbank, CA. Any 'excess' power not taken by the Districts and not used by HHWP's two retail customers is sold by HHWP on the wholesale bulk power market . . . ." As noted in footnote 1, a 1979 Ninth Circuit decision indicates that the City's sale of power to the Airport Tenants and Riverbank are commercial sales within the meaning of the Raker Act. (*United Airlines, supra*, 616 F.2d at pp. 1065–1066.)

The IA also provides for PG&E to sell power to the City when Hetch Hetchy power is insufficient to meet the City's loads. The HHWP Revenue Study explains: "When generation is insufficient to meet its load commitments, HHWP purchases supplemental energy either from PG&E, under its long-term agreement, or from the western power 'spot' (short-term) market. Access to the western transmission grid is available through HHWP's long-term agreement with PG&E."

PG&E filed the IA with the Federal Energy Regulatory Commission (FERC), which has jurisdiction over agreements related to the transmission of electricity. (See 16 U.S.C. § 824 et seq.)

*The 1997 Master Settlement Agreement*

In a 1997 master settlement agreement (MSA), the City and PG&E agreed to settle a number of then outstanding disputes, including the designation of certain accounts as Municipal Load.[5] The parties agreed that the Ferry Building[6] and certain other accounts should be designated Municipal Load, and PG&E agreed to transfer those accounts to service by HHWP, i.e., the City. PG&E waived any claim that accounts then served as Municipal Load were not Municipal Load, and the City waived any claim that accounts then served as non-Municipal Load were Municipal Load. (MSA, § 2.a.v.a, b.)

The MSA left open issues as to any new or changed accounts that might arise thereafter. Section 2.a.v.d of the MSA provided, "Nothing in this [MSA] shall affect the rights of PG&E or City under the [IA] as to any new account arising after January 1, 1997; provided, however, that for purposes of this subsection, 'new account' shall include any material change in use or activity at any existing account, but only to the extent of such material change in use or activity." The MSA contained an integration clause, but no arbitration clause.

Aside from the Ferry Building, the accounts that were designated Municipal Load in the MSA included accounts through which the City billed certain commercial entities for electric service (KSFO Radio, Caito Fisheries, Inc., F. Alioto Fish Co., Frank's Fisherman, Coast Marine Industries, Stevedoring Services of America, Beth Aharon Day School & Jewish Education Center, and Mission Rock Resort).[7] Not included among the accounts designated

---

[5] The HHWP Revenue Study identified possible strategies to enhance HHWP's revenues. One of those strategies was to acquire new Municipal Loads: "[T]here are some municipal loads still being served by PG&E which could arguably be served directly by HHWP. These loads include the San Francisco Housing Authority, the San Francisco Redevelopment Agency, and the Port of San Francisco and their respective tenants."

The City sells power to some municipal departments at an "enterprise rate" that is comparable to PG&E retail rates and thus generates revenues for the City.

[6] In 1994, at the City's request, PG&E transferred the Ferry Building account to the City for service as Municipal Load. In the MSA, PG&E expressly agreed the account was properly designated Municipal Load.

[7] Appendix D of the MSA listed the accounts designated Municipal Load under the terms of the agreement. The accounts are identified by "Account No" and "Supply." For example, listing No. 154 is identified as "TRGP101501" ("Account No") and "PORT/FERRY BLDG" ("Supply"). All of the "Supply" descriptions take a similar form, such as "CITY/ADM BLDG," "PORT/MARITIME," "CITY/HIV CLINIC," or "CITY/LIGHTS." In a declaration filed in this action, David Robinett, utility specialist in the Power Enterprise Department of the San Francisco Public Utilities Commission (SFPUC), averred that he was responsible for "researching and tracking the electric usage accounts that [PG&E] transferred to SFPUC under

Municipal Load in the MSA was Pier 39, "a San Francisco Bay attraction featuring retail shops and restaurants." Pier 39 is served by PG&E as a retail account. The Port leases Pier 39 for a 60-year term to a private entity, which has the right under the contract to sublease or use the property for commercial and retail purposes.[8]

*The Ferry Building in 1997*

When the MSA was signed in 1997, the Ferry Building had approximately 300,000 square feet of interior space. Approximately 88,000 square feet was common space, including stairs, hallways and restrooms. The Port Commission used approximately 82,000 square feet: 42,000 square feet for administrative offices and a hearing room on the second and third floor and 40,000 square feet for a garage and shop on the ground floor. The Port leased another 100,000 square feet to commercial office tenants, and about 30,000 square feet to tenants that sold food or other retail goods and services, including

the [MSA], . . . [which] are identified in Appendix D to the [MSA]." For most of those accounts, he identified "both the locations of the meters that are served by those accounts and the identities of the customers the SFPUC initially billed for electricity usage under those accounts." The account numbers on Robinett's list correspond to the account numbers in appendix D. Robinett's list identifies, inter alia, the customers for those Municipal Load accounts.

█ PG&E argues that this list of customer names is insufficient to establish that customers were private entities using Port property for commercial purposes. We disagree. As the City correctly argues, we may and we shall take judicial notice of the fact that customers such as KSFO Radio, Caito Fisheries, Inc., and F. Alioto Fish Co. are private entities that provide retail or commercial services. (Evid. Code, §§ 452, subd. (g), 459; see *Frohliger v. Richardson* (1923) 63 Cal.App. 209, 214 [218 P. 497] [taking judicial notice of fact that San Diego Mission is a private institution]; *Braun v. New York Life Ins. Co.* (1941) 46 Cal.App.2d 335, 336 [115 P.2d 880] [taking judicial notice of fact that New York Life Insurance Co. does business in Cal.].)

[8] PG&E cites evidence that the reason the City agreed not to include Pier 39 among the Port properties designated Municipal Load in the MSA was that the property was operated under a long-term lease that permitted the lessee to operate or sublease the property for retail and commercial uses. The City disputes the admissibility of the evidence. The evidence is the deposition testimony of Thomas Berliner, who helped negotiate the MSA on the City's behalf. The deposition was taken in the arbitration over the Fifth & Mission parking garage at a time when Berliner no longer worked for the City. In his deposition testimony, Berliner discussed the City's position on what constituted Municipal Load, contrasting such examples as a coffee shop in city hall and Pier 39. The trial court sustained the City's objection to the evidence in this action. (See *Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688 [75 Cal.Rptr.2d 523] [deposition testimony from another proceeding not admissible unless it falls within hearsay exception; disagreeing with *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142, 149, fn. 3 [274 Cal.Rptr. 901], which held such a deposition admissible as effectively equivalent to a declaration]; *L&B Real Estate v. Superior Court* (1998) 67 Cal.App.4th 1342, 1347–1348 [79 Cal.Rptr.2d 759].) PG&E asks us to reverse the trial court's ruling. However, we need not reach this issue because the testimony is not truly material to any of the issues raised in this appeal.

29,500 square feet to the World Trade Club.[9] The tenants included Amtrak Real Estate, Aspen Group, Inc., State Department of Mental Health, Chronicle Publishing Co., Federal Express, Hanse Shipping Agency, IDT Telecommunications, Jenken Freight Services, Limbach & Limbach, Midsummer Mozart Festival, Omar's Café, and the Rockport Group, among many others. At that time, the Ferry Building was not generally open to the public, and the second and third floors were accessible only to tenants or those doing business with the Port. Transit passengers traveled from ferries to the Embarcadero by walking through a tunnel in the building. In sum, 29.33 percent of the interior space was common area, 27.33 percent was occupied by the Port, 10 percent by retail tenants (9.83 percent by the World Trade Club), and 33.33 percent by commercial tenants. The total electric usage in the building was about 320,000 kilowatt hours per month.

*Renovation of the Ferry Building*

In 1997, the Port Commission announced a plan to renovate the Embarcadero area, including the Ferry Building. In 1998, William Wilson and Associates and its successor, Ferry Building Investors, LLC (Ferry Building Investors), were engaged to renovate and lease the Ferry Building as a mixed-use commercial and office complex. In April 2001, the Port and Ferry Building Investors entered into a 66-year ground lease (Ground Lease) for the Ferry Building. In December 2001, Ferry Building Investors entered into a master tenant sublease with Ferry Building Associates, LLC (Ferry Building Associates), which in turn further subleased space in the building to commercial office and retail tenants. Equity Office, LLC (Equity Office), manages the Ferry Building for Ferry Building Investors and Ferry Building Associates.

Existing Ferry Building tenants (including the Port) vacated the premises during renovation. When renovation was complete in April 2003, the Ferry Building had 275,000 square feet of interior space, of which 248,000 was rentable. Approximately 180,000 square feet on the second and third floors was rented as commercial office space. Of this, approximately 3,561 square feet was rented to the Port for use as a hearing room and ancillary purposes. The

---

[9] After PG&E transferred the Ferry Building electrical service account to the City in 1994 and also after the parties signed the MSA, PG&E continued to service the account of the World Trade Club within the Ferry Building. The City objected to the evidence of this fact produced by PG&E, but the trial court overruled its objection. The City produced no contrary evidence on the issue. On appeal, the City argues in a footnote in its opening brief that PG&E's evidence is unclear and disputed, but it does not directly challenge the trial court's evidentiary ruling. The issue is forfeited. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115–1116 [75 Cal.Rptr.2d 27] [appellate court may deny claim on appeal that is unsupported by legal argument applying legal principles to the particular facts of the case on appeal]; *300 DeHaro Street Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257 [75 Cal.Rptr.3d 98] [argument not set forth under separate heading may be disregarded].)

Port did not move its administrative offices back into the building. Approximately 65,000 square feet on the ground floor plus 8,000 square feet of outdoor space on the ground level was rented to retail outlets, another 9,000 square feet of outdoor space was rented for a weekday farmers' market and 35,000 square feet for a Saturday farmers' market. Approximately 100,000 square feet of space on the ground floor of the building, including the retail outlets and common area, became accessible to the public. The tenants in 2003 included Peet's Coffee, The Slanted Door, Cowgirl Creamery, Scharffen Berger Chocolate, Acme Bread Company, Golden Gate Meat Company, Book Passage, Inc., Coblentz, Patch, Duffy & Bass LLP, Embarcadero Financial, and Platinum Advisors LLC. In sum, 13 percent of the interior space was common area, 1 percent was occupied by the Port, 24 percent by retail tenants, and 62 percent by other commercial tenants.

The City characterizes the Ferry Building renovation as a "public and private partnership." The Ground Lease requires Ferry Building Investors to pay the Port an "annual minimum rent" of $1.4 million, and a "Participation Rent" based on the "Total Income" for each calendar year. If Ferry Building Investors subsequently transfers the lease, the Port has rights to share in the proceeds from the transfer. At the end of the lease, the Port will obtain title to any improvements that Ferry Building Investors made to the Ferry Building. Finally, the Ground Lease expressly provides that the City will provide electricity to the building.

*Electrical Service to the Ferry Building During and After the Renovation*

During the Ferry Building's renovation from April 2001 to October 2002, the City sold power to the general contractor. In March 2002, the City and PG&E entered into a "Distribution Service and Extension Agreement" (DSEA) that provided for the installation of new electric facilities to serve the renovated Ferry Building and PG&E energized the new service in May 2002.

Following renovation, total electric usage at the Ferry Building has been about 620,000 kilowatt hours per month. The City bills Equity Office for 100 percent of this electricity at a rate comparable to the rate PG&E would charge if PG&E were serving the Ferry Building. Equity Office bills Ferry Building Associates, which in turn bills subtenants, either on the basis of actual electric usage and cost (most ground floor retailers) or a pro rata share of overall usage. The Port pays Equity Office its pro rata share of the building's electric usage. The City pays PG&E the Municipal Load IA rate for the transmission of this electricity.

## II. PROCEDURAL HISTORY

*Arbitration of Fifth & Mission Garage Designation as Municipal Load*

In 2002, the City and PG&E arbitrated a dispute concerning whether electricity that the City supplied to retail businesses leasing space at the

City-owned Fifth & Mission Garage constituted Municipal Load under the IA. Those retail businesses were Starbucks Coffee, Mel's Diner, Asia Chinese Restaurant, Museum West and a Verizon Wireless cellular antenna. The terms and conditions of the 1997 MSA were not at issue in the arbitration. On October 11, 2002, the arbitrator issued a decision in favor of PG&E. The City complied with the arbitration decision without the necessity of any action by PG&E to confirm the award in the superior court.

*Prior Action and Appeal Regarding Ferry Building Designation*

In a May 2003 notice of dispute, PG&E objected to the City's plan to sell electricity to the new tenants of the renovated Ferry Building, arguing the sales would violate both the IA and the MSA. PG&E also argued the City's sale of electricity to the new Ferry Building tenants conflicted with federal and state tariffs.

PG&E and the City were unable to resolve the Ferry Building dispute between themselves, and PG&E invoked the IA's arbitration provision. In its May 2004 arbitration notice, PG&E estimated damages at $500,000 to $750,000. The City claimed the dispute was not arbitrable and, on May 20, 2004, filed a complaint for declaratory and injunctive relief barring arbitration of the dispute. (*City and County of San Francisco v. Pacific Gas & Electric Co.* (Super. Ct. S.F. City and County, 2004, No. CGC-04-431615).) The City argued that the terms of the MSA governed and, although the MSA incorporated the IA's definition of Municipal Load, it did not incorporate the IA's arbitration provision and did not have an arbitration clause of its own. "The substance of PG&E's allegations in the Notice of Arbitration is that under the definition of 'municipal load,' the City can no longer provide electric services to the Ferry Building on the grounds that the use of the Ferry Building has materially changed since the parties entered into the [MSA] in 1997. . . . Among other things, PG&E claims that by continuing to provide electric services to the Ferry Building, the City is violating the [MSA]." The trial court agreed with the City and held the parties' dispute was not subject to arbitration. In February 2007, Division One of this court affirmed. (*City and County of San Francisco v. Pacific Gas & Electric Co.* (Feb. 27, 2007, A108473) [nonpub. opn.]; hereafter, prior appellate opinion.)[10]

*The Instant Action*

PG&E filed a government claim against the City and, after it was denied, filed a complaint for declaratory relief and breach of contract. In its first

---

[10] We cite this unpublished opinion because the parties argue it has collateral estoppel effect on this case. (See Cal. Rules of Court, rule 8.1115(b)(1).) We may also appropriately cite the decision to explain the factual background of the case and not as legal authority. (See *Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 443, fn. 2 [29 Cal.Rptr.2d 441] [discussing Cal. Rules of Court, former rule 977].)

cause of action, PG&E sought a "judicial declaration that the new service requested by the City as part of the Ferry Building remodeling project constitutes a 'new account' under the [MSA], that there has been a material change in use and activity at the Ferry Building, and that the Ferry Building no longer qualifies as municipal load under the [MSA] or [IA] such that PG&E is not required to transport Hetch Hetchy power to the Ferry Building." In its second cause of action, PG&E alleged that the City breached its obligations under the MSA "in that it has continued to serve Hetch Hetchy power to the Ferry Building under the [MSA] and continued to treat the Ferry Building as municipal load despite 1) the new service [and] 2) the material change in use and activity" at the building. PG&E sought breach of contract damages.

The City answered the complaint and filed a cross-complaint for declaratory relief. Specifically, the City sought a declaration "that the renovation of the Ferry Building has not resulted in a 'material change in use or activity' at the Ferry Building as that term is used in the MSA," or alternatively, that despite any material change in use or activity at the Ferry Building, the building remained Municipal Load.

*Summary Adjudication Proceeding*

The parties filed cross-motions for summary adjudication on their respective claims for declaratory relief. The motions were decided on stipulated facts and joint exhibits, as well as disputed separate exhibits and requests for judicial notice.

The trial court (Hon. Charlotte W. Woolard) granted PG&E's motion and denied the City's motion. The court ruled that there had been a 100 percent material change in the use and activity of the electricity account since the building's renovation. "The Ferry Building has been transformed into a commercial enterprise. The Port of San Francisco's presence at the Ferry Building has materially changed from a significant percentage to a greatly reduced percentage, and the electric usage at the Ferry Building has increased substantially." At the hearing, the court said, "In my mind it really is a complete transformation. [¶] . . . [¶] . . . [I]t's not even close." Citing the Raker Act and IA section 1.43, the court ruled that the City's electric service to the Ferry Building did not qualify as Municipal Load under the IA. "[The City] is selling electricity to a private corporation called Ferry Building Investors which in turn sells it to the subtenants at the Ferry Building. [The City] is in violation of Section 1.43 of the [IA] because it is selling electricity to a private entity and because this private entity is reselling the electricity. The electricity is not being used for [the City's] 'actual municipal public purposes,' and is not municipal load." The court made the following judicial declarations:

"1. There has been a material change in the use and activity at the Ferry Building following the remodeling project and the extent of this change is one hundred (100) percent.

"2. Electric service to Ferry Building Investors at the Ferry Building does not qualify as municipal load under the [IA].

"3. PG&E is not required by the [IA] to transport Hetch Hetchy power to Ferry Building Investors or the subtenants at the Ferry Building.

"4. [The City] is prohibited by the [IA] from selling PG&E-transmitted electricity to Ferry Building Investors or the subtenants at the Ferry Building.

"5. PG&E is entitled to serve electricity to Ferry Building Investors and its subtenants at the Ferry Building."

*Bench Trial*

Prior to a September 2009 bench trial (Hon. Curtis E.A. Karnow) on PG&E's breach of contract claim, the City argued that PG&E could not recover for a breach of the IA because its government claim alleged only a breach of the MSA and any cause of action not presented in the government claim was barred by Government Code section 945.4. After presentation of PG&E's evidence, the City moved for judgment pursuant to Code of Civil Procedure section 631.8 on the ground that PG&E had not proved a breach of the MSA that entitled it to damages. Deferring its ruling until completion of the City's defense case, the court ultimately agreed and entered judgment for the City. In its statement of decision, the court referenced the prior appellate decision and wrote, "The Court of Appeal held that: 'The only avenue for PG&E to raise a valid claim that the Ferry Building is no longer municipal load is to invoke section 2.a.v.d. of the M[S]A, and argue that there has been a "material change in use or activity" regarding the Ferry Building, rendering it a "new account" under the terms and provisions of the M[S]A.' " When PG&E thereafter filed a government claim in the instant action, it alleged only a breach of the MSA, not a breach of the IA. Judge Karnow concluded that PG&E had not proved a breach of the MSA that would entitle it to damages.

*Final Judgment*

On November 19, 2009, the trial court entered final judgment in this action. The court entered a declaratory judgment encompassing Judge Woolard's rulings on summary adjudication and ordered that PG&E "take nothing" on its breach of contract claim.

## III. Discussion

### A. *The City's Appeal*

The City appeals the trial court's denial of the City's and grant of PG&E's motions for summary adjudication of their claims for declaratory relief. The City argues the evidence established that use of electrical power at the Ferry Building did not materially change following renovation and that the MSA therefore dictates that the City's supply of electricity qualifies as Municipal Load. Alternatively, the City argues that any material change was less than 100 percent and that the trial court's declaratory relief judgment exceeded the scope of the controversy presented. We find that the City's arguments lack merit.

Summary adjudication of a claim is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to [adjudication] as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see *id.*, subd. (f).) The party moving for summary adjudication bears the burden of showing there is no triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.) An order granting or denying summary adjudication is reviewed de novo. (*Id.* at p. 860.)

### 1. *Municipal Load*

The parties agree that the MSA dictates that the City's supply of energy to the Ferry Building be classified as Municipal Load unless it qualifies as a "new account." (MSA, § 2.a.v.) Under the MSA, a new account includes "any material change in use or activity at any existing account, but only to the extent of such material change in use or activity." (MSA, § 2.a.v.d.) The MSA provides that the determination of whether a new account is Municipal Load is governed by the IA. (*Ibid.*) Under the IA, Municipal Load is defined as "[p]ower required for City's municipal public purposes pursuant to the Raker Act, as may be designated by the City, both inside and outside of City[,] . . . not includ[ing] load served by City as resale load." (IA, § 1.43.) The Raker Act provides that a priority use for Hetch Hetchy power shall be "for the actual municipal public purposes of [the City] (which purposes shall not include sale to private persons or corporations)." (Raker Act, § 9(*l*).)

The threshold question before the trial court was whether the renovated Ferry Building qualified as a new account under the MSA. If the answer to that question was yes, the court then had to determine whether energy use at the renovated Ferry Building qualified as Municipal Load under the IA. To answer the new account question, the court needed to determine whether any

change in the Ferry Building's use of power or activity was "material." A change would be material in this context if it affected the classification of the Ferry Building's energy use as Municipal Load under the IA's definition of that term. Therefore, the two questions (whether the renovated Ferry Building is a new account under the MSA and whether it is Municipal Load under the IA) merge into a single question: whether the use of power or activity at the Ferry Building *changed* following the renovation such that its account no longer served "municipal public purposes" as that phrase was used and qualified in the IA definition of Municipal Load.[11]

The City argues that the phrase "municipal public purposes" has been broadly construed by the courts in a variety of contexts and that the City's supplying energy to the renovated Ferry Building fits comfortably within the meaning of the phrase as it is used in the Raker Act and incorporated in the IA. The City further argues that the qualifications on the phrase are either inapplicable ("not includ[ing] load served by City as resale load" in the IA) or have been waived by the parties ("not includ[ing] sale to private persons or corporations" in the Raker Act). We consider each argument in turn.

### 2. *Municipal Public Purposes*

The City relies primarily on cases that consider whether a city has acted within the scope of its legitimate municipal authority. A good example is *Larsen v. City & County of S. F.* (1957) 152 Cal.App.2d 355 [313 P.2d 959] (*Larsen*). In *Larsen*, another division of this court held that the City acted within its eminent domain authority when it condemned and purchased property at Fifth and Mission Streets, contracted with a private company to construct a parking garage on the site, and planned to lease the completed garage (to be operated by a private company) for 50 years. (*Id.* at pp. 358–359, 363–364, 371.) Under the anticipated lease, parking rates would be set by the City, operating profits would be used to repay the construction loan, the lease would terminate once the loan was paid off, and the City would operate the garage thereafter. No commercial activity in the garage not customarily associated with parking operations was anticipated. The court held that the City's exercise of eminent domain to acquire property for this project was valid because it served the "public purpose" of relieving street congestion and reducing traffic hazards and the City retained sufficient control over the garage's operation that the project could not be characterized as primarily a

---

[11] The City essentially acknowledges that the new account and Municipal Load issues are one and the same because it argues both (a) that there has been no material change in use or activity at the Ferry Building because the renovated building continues to serve municipal public purposes and (b) that, even if there has been a material change in use or activity at the Ferry Building, the renovated building still qualifies as Municipal Load because it serves municipal public purposes.

private business for private gain. (*Id.* at pp. 362–363 [distinguishing *City & County of San Francisco v. Ross* (1955) 44 Cal.2d 52, 59–60 [279 P.2d 529], which held that a similar project was an invalid exercise of eminent domain because the City did not control the parking rates].)[12] In the portion of the opinion that the City cites in its appellate briefs, the *Larsen* court extensively quoted from an out-of-state decision that held a similar municipal parking garage project did not violate an *equal protection* principle that government acts should not exclusively benefit private individuals.[13] (*Larsen,* at pp. 369–370, quoting *Barnes v. City of New Haven* (1953) 140 Conn. 8 [98 A.2d 523, 527, 529].) The *Larsen* court also held the parking garage project came within the scope of " 'municipal affairs' " as to which a charter city may freely legislate subject only to the restrictions of its own charter.[14] (*Larsen,* at p. 366.)

■ Even if we assume that "municipal public purposes," as used in the Raker Act, has the same meaning as the public purposes discussed in *Larsen* and like cases, we cannot conclude that the City's supply of power to the tenants of the renovated Ferry Building serves such purposes. We have no doubt that the *renovation itself* served public purposes and thus that the City acted legitimately when it contributed public property and expended public funds on the project and retained significant control over the postrenovation use of the building. The project enhanced and encouraged public use of Port property that not only serves as a transit hub but also provides access to the natural resource of San Francisco Bay. (See *Haggerty v. City of Oakland* (1958) 161 Cal.App.2d 407, 410–413, 415–417 [326 P.2d 957] [port's construction and lease of banquet and convention facility on its property valid because served public purpose of developing the port and port retained sufficient control], disapproved on other grounds in *Wong v. Di Grazia* (1963) 60 Cal.2d 525, 537 [35 Cal.Rptr. 241, 386 P.2d 817].) Economic development alone is a legitimate public purpose, at least when government involvement is

---

[12] The City also cites *Egan v. San Francisco* (1913) 165 Cal. 576, 580–581, 586 [133 P. 294] (holding invalid an agreement allowing private corporation to erect opera house on City land and ceding control and management of the building and land to a board not controlled by the City); see *id.* at page 584 ("use by a private corporation was not a public use . . . [even if] the purposes to which the property was to be applied were, to some extent at least, within the scope of municipal activities") and *Hiller v. City of Los Angeles* (1961) 197 Cal.App.2d 685, 688–692 [17 Cal.Rptr. 579] (50-year lease of public property for operation of zoo was valid because city retained sufficient control).

[13] The City further cites *Pipes v. Hilderbrand* (1952) 110 Cal.App.2d 645, 646, 648–649 [243 P.2d 123] (city's construction and lease of airport hangars to private company valid because it promoted development of the municipal airport) and *Harter v. San Jose* (1904) 141 Cal. 659, 660, 665–667 [75 P. 344] (lease of public property within public park for construction and operation of hotel valid because it promoted public use of the park).

[14] See also the following case cited by the City: *Bank v. Bell* (1923) 62 Cal.App. 320, 330, 334–335 [217 P. 538] (City of Berkeley's establishment of public food market was a municipal affair).

necessary for that development to occur. (See *Redevelopment Agency v. Hayes* (1954) 122 Cal.App.2d 777, 790 [266 P.2d 105] [redevelopment of blighted area serves public purpose because government intervention is required to eliminate blight and government will impose restrictions on use to prevent renewed blight]; *id.* at p. 798 [redevelopment of area that was not slum but was laid out in irregular lots not conforming to the contours of the land required government intervention and thus served public purpose].) The City extensively cites the declarations of various public bodies that approved aspects of the Ferry Building renovation stating that the renovation served a legitimate public purpose. We do not question those conclusions.

The question presented here, however, is not whether the *renovation* of the Ferry Building served a legitimate public purpose but whether the *sale of electricity* by the City to commercial tenants of the *renovated* Ferry Building at prevailing retail rates serves a municipal public purpose. The City does not argue that its sale of electricity to the tenants was or is part of its public investment in redevelopment of the property. It concedes that it is charging the same rates that PG&E would charge if the account was not Municipal Load, and it is undisputed that PG&E stands ready and willing to sell power to the tenants if it prevails in this lawsuit. Thus, the City is not providing an unavailable or subsidized resource to the tenants to help support the redevelopment project. Rather, the City is acting in a proprietary capacity: it is selling a resource it owns to available customers at a profit. (Cf. *Larsen, supra,* 152 Cal.App.2d at pp. 367–368 [holding City was acting in a governmental rather than a proprietary capacity in parking garage project].) An analogy is easily drawn to the City's sale of Hetch Hetchy power to tenants of the San Francisco Airport. The development of the airport itself served a municipal public purpose. (See *Krenwinkle v. City of Los Angeles* (1935) 4 Cal.2d 611, 614–615 [51 P.2d 1098]; *City & County of San Francisco v. Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 133 [22 Cal.Rptr. 216].) However, the sale of Hetch Hetchy power to private airport tenants is a commercial use of the power within the meaning of the Raker Act. (See *United Airlines, supra,* 616 F.2d at pp. 1065–1066.) Consistent with that interpretation of the Raker Act, the sale of that power to airport tenants is not Municipal Load under the IA, but Firm Resale Load. As noted in footnote 5, *ante,* Firm Resale Load serves a commercial purpose under the terms of the Raker Act. The sale of Hetch Hetchy power to tenants of the renovated Ferry Building is likewise a commercial rather than a municipal use and thus also does not qualify as Municipal Load under the IA.

The City argues that the definition of Municipal Load in the IA requires us to defer to the City's judgment as to what constitutes municipal public purposes. The IA defines Municipal Load as "[p]ower required for City's municipal public purposes pursuant to the Raker Act, *as may be designated by the City* . . . ." (Italics added.) The City also cites cases holding that

" 'what is for the public good, and what are public purposes, "are questions which the legislature must decide upon its own judgment, in respect to which it is vested with a large discretion which cannot be controlled by the courts . . . ." ' " (*Chamber of Commerce v. Stephens* (1931) 212 Cal. 607, 612 [299 P. 728] (*Chamber of Commerce*); see *City of Oakland v. Williams* (1929) 206 Cal. 315, 332–333 [274 P. 328] (*Williams*).) The City's argument seems to be that both PG&E and this court must accept the City's judgment (designation) regarding what constitutes a public purpose. However, the cases cited require judicial deference to legislative policy decisions (i.e., whether a proposed use of public property for a municipal public purpose is wise), not whether the use exceeds the city's constitutional authority. (*Chamber of Commerce*, at p. 612 [court must defer " ' "except, perhaps, where [the city's] action is clearly *evasive* . . . [;] the courts can enforce *only* those limitations which the Constitution imposes" ' "]; *Williams*, at p. 333 ["[q]uestions of policy are not submitted to judicial determination . . ."].)

In this case, we review neither a legislative policy decision nor a constitutional limitation on a city's power. Rather, we interpret a contractual limitation on the City's power (albeit one that incorporates a statutory standard). Both the contract and statute place limits on the City's use of Hetch Hetchy power so that the interests of other entities (PG&E and irrigation districts) are protected. If the City's unilateral designation were sufficient to qualify a power use as Municipal Load and serving a municipal public purpose, there would be little protection for those interests.

The IA's phrase, "as may be designated by the City," can be more reasonably construed to mean that Municipal Load means only those municipal public purposes which are chosen and designated by the City to be served by Hetch Hetchy power. In that fashion, PG&E is put on notice of the accounts which the City claims fall into that category.

Finally, the City argues that the pre- and postrenovation use of the property is fundamentally the same: a mixed-use retail and office development that in part directly served the Port's needs. The City contends that because PG&E conceded in the MSA that the prerenovation use of the Ferry Building was Municipal Load, it must therefore also concede that the postrenovation use of the property is Municipal Load. The City's argument glosses over the dramatic change in the commercial uses before and after the renovation. Prerenovation, the Port occupied a total of 82,000 square feet in the building. Commercial retail tenants that obtained their power from the City (i.e., retail outlets other than the World Trade Club) occupied a mere 500 square feet and could reasonably be called incidental to the Port's use of the building. Postrenovation, the building housed only 3,500 square feet of Port working space. The ground floor of the building has been transformed into a 65,000-square-foot retail marketplace, not including 8,000 square feet of new outdoor dining

space. Total electrical power usage in the building almost doubled, from 320,000 to 620,000 kilowatt hours per month. Moreover, the master tenant of the building was no longer the Port but Ferry Building Associates, a private company operating the building for profit.

The City argues that PG&E waived any claim that the renovated Ferry Building was not Municipal Load when it agreed to install new high-voltage facilities for the building pursuant to the DSEA, knowing that the City would be providing electricity to the renovated building through those facilities. The City contends that the planned increase in retail and commercial use of the renovated building was well known at that time. The City itself had specifically informed PG&E the first floor would house 19 restaurants. The City also cites a November 2003 letter from PG&E to FERC regarding the new Ferry Building facilities, in which PG&E wrote that it installed the facilities for service of the City's load. "In so doing," the City argues, "PG&E implicitly acknowledged that the renovated Ferry Building would be the City's 'Municipal Load.'" We disagree. The letter was written in November 2003, well after PG&E formally protested the City's provision of electrical service to the tenants in the building in its May 2003 notice of dispute. PG&E issued the notice of dispute about a month after the renovation was complete in April 2003. That PG&E waited until the renovation was complete before formally protesting the City's continuing service of the building does not amount to a waiver.

■ We conclude that the trial court correctly determined that the postrenovation use of electricity at the Ferry Building does not serve municipal public purposes within the meaning of the Raker Act and thus is not Municipal Load under the IA.

### a. *Sale to Private Persons or Corporations*

Even if we concluded the use of electricity at the renovated Ferry Building does serve municipal purposes, we would conclude it is not Municipal Load because it involves sale of electricity to private persons or corporations. As noted, the Raker Act provides that a priority use for City-generated power at Hetch Hetchy shall be for municipal public purposes, which "shall not include sale to private persons or corporations." The City does not dispute that the qualification—"not includ[ing] sale to private persons or corporations"—is incorporated into the IA's definition of Municipal Load. However, the City argues that it is not "selling" power to Equity Office or Ferry Building Investors. Alternatively, it argues that PG&E has waived or forfeited this limitation on the definition of Municipal Load.

The City argues that its sale of power to the renovated Ferry Building "is [not a] sale of electricity to a 'private person or corporation' as understood in

the Raker Act. Under the City's arrangement with Ferry Building Investors, that entity is a quasi-agent of the City, aiding the City to accomplish its 'municipal public purposes' at the Ferry Building." To support this argument, the City cites a case holding that a city may enter into contracts (impliedly with private entities) to carry out municipal functions as long as the city retains sufficient control over the municipal functions. (*Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 [130 Cal.Rptr. 196].) As PG&E correctly observes, the cited case does not support the City's argument that its contract with Ferry Building Investors (the Ground Lease) is anything other than a contract of *sale*. The Ground Lease requires Ferry Building Investors to "purchase" all of its power from the City. The City stipulated that Ferry Building Investors is a private person or corporation. Thus, the City's provision of power to the renovated Ferry Building at prevailing market rates is a sale to a private person or corporation, taking it outside the IA's definition of Municipal Load.[15]

The City also argues that PG&E waived the exclusion from Municipal Load for "sale[s] to private persons or corporations" because it "has agreed in the past that the City's 'Municipal Load' can include service to private entities using Port property." The City specifically cites PG&E's agreement in the MSA that certain Port accounts qualify as Municipal Load even though they served private entities such as KSFO Radio, Caito Fisheries, Inc., F. Alioto Fish Co., Frank's Fisherman, Coast Marine Industries, Stevedoring Services of America, Beth Aharon Day School & Jewish Education Center, and Mission Rock Resort. The City further notes that in 1994 (before the parties executed the MSA) PG&E agreed to designate the prerenovation Ferry Building account as Municipal Load even though it involved sales of City power to private entities engaged in commercial or retail activities. The City argues that this conduct demonstrates that PG&E always understood that Municipal Load may include sales of power to private persons or corporations despite the language of the IA and the Raker Act.

■ The City's legal authority does not support its argument. In *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753 [8 Cal.Rptr. 427, 356 P.2d 171], the Supreme Court explained, " 'The acts of the parties under

---

[15] As noted, the IA's definition of Municipal Load provides, "such load shall not include load served by City as resale load." (IA, § 1.43.) PG&E impliedly argues that "resale load" in the IA's definition of Municipal Load has the same meaning as the Raker Act's section 9(*l*) restriction, "not includ[ing] sale to private persons or corporations." Because PG&E does not argue that the City's sale of power to the renovated Ferry Building falls within the exclusion of "resale load" for reasons other than the reasons it falls within the exclusion of "sale to private persons or corporations," we need not consider the City's arguments that its sale of power to the renovated Ferry Building is not "resale load." We also need not consider the City's arguments that its sale of power to the renovated Ferry Building is not a sale for resale, which is prohibited by section 6 of the Raker Act.

[a] contract afford one of the most reliable means of arriving at their intention; and, while not conclusive, the construction thus given to a contract by the parties *before any controversy has arisen as to its meaning* will, when reasonable, be adopted and enforced by the courts.' " (Italics added.) The other case cited by the City similarly states, "The conduct of the parties after execution of the contract and *before any controversy has arisen as to its effect* affords the most reliable evidence of the parties' intentions. [Citations.]" (*Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189–1190 [242 Cal.Rptr. 403], italics added.) Here, the City has stipulated that, in the 10-year period following the parties' execution of the IA (a period that includes the time when PG&E agreed to designate the prerenovation Ferry Building Municipal Load in 1994 and to designate other Port accounts Municipal Load in the 1997 MSA), "the Parties had multiple disagreements concerning whether the City's electric service to various customers at Port properties qualified as Municipal Load." Because PG&E's agreement to designate the prerenovation Ferry Building and other Port accounts as Municipal Load occurred at a time the parties were disputing the meaning of Municipal Load, PG&E's agreement to those designations does not reliably reflect PG&E's original understanding of the meaning of the term in the IA.

The City also argues that PG&E expressly waived the exclusion from Municipal Load of sales to private persons and corporations. As noted, in the MSA PG&E waived all claims that an account then designated Municipal Load was not. (MSA, § 2.a.v.a.) The City agreed to a similar release and waiver (MSA, § 2.a.v.b), but the MSA provides that the *City's* waiver shall not be "construed to affect the definition, meaning or interpretation of the terms 'municipal load' or 'municipal purpose' as those terms are used in the [IA] of [*sic*] the Raker Act . . . ." (MSA § 2.a.v.c.) The City argues that the absence of a similar provision in the MSA applicable to PG&E's waiver means that PG&E's concession that certain accounts involving sales of electricity by the Port to private persons or corporations were Municipal Load affected the definition of Municipal Load under the IA and essentially waived the private sale qualification.

We do not agree that the *absence* of a corollary contract clause in the MSA amounts to an implied waiver of the exclusion for "sale[s] to private persons or corporations." PG&E's *express* waiver in the MSA applied only to accounts then specifically designated in the MSA and thus did not apply to the renovated Ferry Building to the extent it was a new account due to material changes in use or activity. As we have discussed, PG&E's agreement to the MSA occurred in the resolution of a controversy between the parties and thus cannot be considered reliable evidence of the parties' *original* intent regarding the term Municipal Load and the applicability of the exclusion for sales to private persons or corporations. The content of the MSA also does

not support an argument that PG&E *impliedly* waived the exclusion. Although the parties agreed to designate several accounts involving sales of electricity to private entities as Municipal Load, they significantly did *not* include the Pier 39 account, a major retail development on Port property. The record also discloses that PG&E challenged the City's designation of the Fifth & Mission parking garage as Municipal Load. Thus, PG&E's prior agreements that certain identified accounts would be accepted as Municipal Load, even though those accounts included sales to private entities, does not demonstrate that PG&E has categorically waived the statutory and contractual exclusions of sales to private persons or corporations from Municipal Load.

In sum, the scope and magnitude of the postrenovation changes in the use of electricity at the Ferry Building amply support the conclusion that the account is no longer Municipal Load under the IA. The account involves the sale of electricity to private persons or corporations and no longer serves primarily municipal public purposes. Thus, the changes in use and activity at the Ferry Building following renovation were a "material change in use or activity" under MSA section 2.a.v.d. (in that they would affect the designation of the account as Municipal Load under the IA). The IA rather than the MSA controls whether the account is properly characterized as Municipal Load and the account is no longer Municipal Load under the IA.

### b. *Percentage Change*

The City argues that the trial court's ruling that the material change in the Ferry Building following the renovation was 100 percent is contrary to the undisputed evidence in the record.[16] It argues that the Ferry Building continued to be a mixed-use commercial and retail building before and after the renovation, with changes only in the percentage of Port use. This ignores the fact that the Port was the master tenant before the renovation, and Ferry Building Investors became the master tenant after. Before the renovation, the City charged the commercial and retail tenants for electricity either directly or as a component of rent; after the renovation, the City sold all electricity to Equity Office, which in turn charged the tenants. As a tenant of the Ferry Building, before the renovation the Port received electrical service directly from the City; after the renovation, it received electricity from Equity Office and paid retail rates for that electricity. We agree with the trial court that the only reasonable inference from these undisputed facts is that there was a 100 percent material change in the building's use.

---

[16] PG&E argues the City forfeited this argument by not raising it below. We need not address this argument because we reject the City's argument on the merits.

c. *Scope of Declaratory Relief*

The City argues that the trial court's declaratory relief judgment (specifically the fourth and fifth judicial declarations) exceeded the scope of the issues before the court.[17] The City argues that the fourth declaration, which "prohibits" the City from selling PG&E electricity to Ferry Building Investors or Ferry Building subtenants, is beyond the court's powers because the IA governs PG&E's transmission of electricity on the City's behalf, not the City's sale of electricity. The City argues that the fifth declaration, which states PG&E is entitled to provide electricity to Ferry Building Investors and Ferry Building subtenants, is unauthorized because statutes such as the Federal Power Act (see 16 U.S.C.§ 824k(h)(2)) govern who can and cannot sell electricity, not the contractual provisions of the IA. We conclude that the judicial declarations are appropriate if understood to be limited to a declaration of the parties' contractual rights under the IA and MSA.

The fourth declaration states: "[The City] is prohibited by the [IA] from selling PG&E-transmitted electricity to Ferry Building Investors or the subtenants at the Ferry Building." Under the IA, PG&E's obligation to transmit Hetch Hetchy power is limited to Municipal Load and Firm Resale Load. (IA, § 2.7.3.) That is, the only permissible uses of power *PG&E transmits to the City pursuant to the IA* is Municipal Load and Firm Resale Load. We have determined that the power the City provides to the renovated Ferry Building is not Municipal Load and it is undisputed that the power is not Firm Resale Load. Thus, the City's sale of power *transmitted by PG&E under the IA* to the renovated Ferry Building is impermissible and prohibited. The court's fourth declaration in this action does not bar alternative agreements between the City and PG&E for provision of power to the Ferry Building.

The fifth declaration states, "PG&E is entitled to serve electricity to Ferry Building Investors and its subtenants at the Ferry Building." PG&E owns the electricity transmission and distribution network serving San Francisco. Under the IA, PG&E is only obligated to transmit electricity for City uses to the extent of Municipal Load and Firm Resale Load. (IA, § 2.7.3.) Because the City's sale of electricity to the renovated Ferry Building is neither Municipal

---

[17] ▉ PG&E argues the City forfeited these arguments because it did not object to PG&E's specific request for declaratory relief, which the trial court adopted in its entirety. We disagree. If the declaratory relief exceeds the bounds of the contract the court was asked to interpret, the court acted beyond its judicial authority and the declaration must be modified. "While the court in a declaratory relief action may properly determine questions as to rights and duties arising out of an existing contract [citations], it may not make a new contract for the parties or, in lieu of construing an existing contract, incorporate new obligations into it. [Citation.]" (*Culbertson v. Cizek* (1964) 225 Cal.App.2d 451, 462 [37 Cal.Rptr. 548].)

Load or Firm Resale Load, PG&E has no obligation under the IA to transmit electricity for the City for sale to the Ferry Building tenants. Therefore, *insofar as the IA is concerned*, PG&E is entitled to provide electricity directly to the Ferry Building and its tenants.

So construed, there is no error in the scope of the declaratory relief granted by the trial court.

B. *PG&E's Appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

We vacate the November 19, 2009 final judgment. We affirm the July 16, 2009 order granting summary adjudication to PG&E and denying summary adjudication to the City. We reverse the November 19, 2009 order granting the City's motion for judgment on PG&E's claim for damages for breach of contract, and remand that claim for consideration under the IA. PG&E shall recover its costs on both the appeal and the cross-appeal.

Simons, Acting P. J., and Needham, J., concurred.

---

*See footnote, *ante*, page 897.